507 So.2d 291 (1987)
STATE of Louisiana, Plaintiff-Appellee,
v.
Floyd TEZENO, Defendant-Appellant.
No. CR 86-1152.
Court of Appeal of Louisiana, Third Circuit.
May 13, 1987.
*292 Gary J. Ortego, Ortego & Dupre, Ville Platte, for defendant-appellant.
J. William Pucheu, Dist. Atty., Richard Vidrine, Asst. Dist. Atty., Ville Platte, for plaintiff-appellee.
Before DOMENGEAUX, DOUCET and KNOLL, JJ.
DOUCET, Judge.
On May 23, 1986, defendant, Floyd Tezeno, was convicted of second degree murder, a violation of LSA-R.S. 14:30.1. As required by law he was sentenced to serve life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. Defendant now appeals raising two assignments of error:
1. "The trial court erred in not granting defendant's motion for a new trial when said trial court stated that there was sufficient evidence presented by the State of Louisiana to prove beyond a reasonable doubt that [sic] should sustain a verdict of second degree murder."
2. "The trial court erred in allowing the State of Louisiana, through the Evangeline Parish District Attorney's Office to present and enter [sic] evidence certain photographs that had no evidential and probative value but would serve to outrage and prejudice the jury in this matter."

FACTS
The defendant, Floyd Tezeno, and the victim, Cassie Frank, lived together in Ville Platte as common-law husband and wife for a number of years. Defendant was the father of the victim's one-year-old son. In late August or early September 1985, the victim and her two children more or less moved out of the apartment she shared with the defendant into the apartment of her mother, Mrs. Elsie Frank.
On the evening of October 3, 1985, the victim was seated in the living room watching television and talking with her mother. Shortly after midnight on October 4, 1985, the defendant knocked on the door of the apartment. Cassie got up, opened the door, and started to return to her chair. Meanwhile, upon hearing the knock at the door, Charles Frank, the victim's brother, left his bedroom where he was watching television and walked down to a hallway to a point at which he could see into the living room.
Mrs. Frank and Charles both testified that the defendant walked into the living room and fired one shot at Cassie which missed and struck a wall. As Cassie and her mother attempted to hide behind furniture, the defendant fired a second shot which struck Cassie in her neck. Bleeding, she turned and ran through the kitchen and out of the back door.
Defendant sat down on a coffee table and Mrs. Frank wrestled the gun from his hands. The defendant then asked to see his son because he knew he was "going to prison". After seeing his son defendant walked out of the front door and stood there a moment. He then ran across the front yard past the adjoining apartment of Sandra Campbell who saw the defendant as he passed by. Mrs. Campbell's daughter, Tiffany, awoke when she heard screaming. Looking out of her bedroom window, she saw the victim run by towards the rear of the building with the defendant chasing her. After they passed she heard more screams coming from the rear of the apartment *293 building. About that time Mrs. Frank knocked on the front door of the Campbell apartment looking for Cassie. Tiffany and Mrs. Frank walked through the apartment to the back door where they found Cassie lying on a small cement back porch with a pitchfork stuck into her face. Mrs. Frank pulled the pitchfork out of her daughter's face, threw it aside and began screaming.
The defendant was arrested shortly thereafter and gave a statement confessing that he had entered the Frank's apartment, fired a shot, went around the rear of the building, saw Cassie, grabbed something, and hit her with it.
At trial Mrs. Frank identified a .25 caliber pistol as the one she had taken from the defendant after the shooting. Christopher Henderson, a firearms identification expert, testified that a bullet taken from the victim's neck was fired from that particular pistol. Dr. George McCormick, a forensic pathologist, testified that the victim died from shock following the loss of blood caused by the combined effects of the gunshot wound to the neck and facial lacerations which he stated were consistent with the victim having been stabbed with a pitchfork. He further stated that the bullet struck and partially severed a major artery which would have, in and of itself, caused the death of the victim if not treated immediately.
In an attempt to establish a defense of intoxication the defendant presented several witnesses who established that he had been drinking on the night of, and prior to, the homicide. Dr. McCormick also testified in his capacity as an expert on the effects of ethanol intoxication.
The jury returned a unanimous verdict of guilty of second degree murder. Defendant filed a motion for a new trial claiming that the evidence should not have sustained a verdict of second degree murder. The trial court denied the motion and defendant now appeals.

ASSIGNMENT OF ERROR ONE
In addressing defendant's first assignment of error we will treat it as one claiming that the evidence was insufficient to support a conviction of the offense charged. We feel this is what defendant truly intended by this assignment of error since the trial judge could not have granted the motion for a new trial based on the grounds asserted by the defendant. See State v. Korman, 439 So.2d 1099 (La.App. 1st Cir.1983).
Our review of this assignment of error is limited to determining whether or not, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime of second degree murder beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Graham, 422 So.2d 123 (La.1982).
LSA-R.S. 14:30.1 reads in pertinent part:
Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
The essential element at issue on appeal is specific intent. Specific intent is defined in LSA-R.S. 14:10(1):
(1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
Intent may be inferred from the circumstances of the transaction. LSA-R.S. 15:445.
Defendant claims that he was precluded from possessing the requisite specific intent because he was intoxicated. LSA-R.S. 14:15(2). The burden is upon the defendant to prove the existence of such a state of intoxication at the time of the offense. State v. Rivers, 444 So.2d 1384 (La.App. 3rd Cir.1984).
Mrs. Frank and her son Charles witnessed the defendant shoot the victim and both testified that the defendant "looked like he knew what he was doing." Charles Frank also testified that when the defendant *294 spoke, moments before shooting Cassie, he was not slurring his speech.
After being taken into custody on the morning of October 4, 1985, defendant was advised of his rights at approximately 3:20 a.m. at which time he informed police officers that he would talk to them later that morning. Jack Aucoin, the Assistant Chief of Police who informed the defendant of his rights, testified that he could tell the defendant had been drinking but that he appeared to know what he was doing and appeared able to give a statement if he had so desired. The rights form was introduced in evidence and shows that defendant signed the form stating that he understood his rights. At approximately 10:00 a.m. that morning defendant gave the inculpatory statement to Officer Linda Brown after again being advised of his rights and waiving them.
Philip Dicks testified that he and the defendant had been drinking for several hours on the evening of October 3, 1985. His testimony was partially confirmed by Willa Mae Jack, a barmaid at the "J-Club" where the defendant was drinking. From their testimony it appears that defendant drank no more than one-half of a fifth of wine, one beer, and almost one-half of a pint of gin that evening. The defendant's mother testified that he came home drunk about 10:00 p.m. and left again shortly thereafter.
Dr. McCormick testified about the effect of ethanol intoxication on human behavior although he admitted that his experience was related to the effects of intoxication on performance behavior such as operating a motor vehicle. Much of his testimony is phrased in terms of an individual's blood alcohol content. The defendant was given a photo-electric intoximeter breath test following his arrest. Although the results are contained in the record as a response to a motion for discovery, those results were never admitted into evidence and cannot be considered on appeal. Whatever his blood alcohol content when the test was given, it would have been approximately .045 percent by weight higher at 12:30 a.m. shortly after the homicide was committed. The thrust of Dr. McCormick's testimony was that in order to negate the specific intent to intentionally injure someone a person's blood alcohol content has to be much higher than the level at which a person is presumed by law to be driving while under the influence of alcohol beverages.
After carefully reviewing this evidence in a light most favorable to the prosecution we conclude that any rational trier of fact could have found that the defendant had the specific intent to kill Cassie Frank or inflict great bodily harm on her when he shot her in the neck and stabbed her in the face with a pitchfork.

ASSIGNMENT OF ERROR TWO
In this assignment of error the defendant contends that the photographs admitted by the trial court were not relevant or probative and only served to prejudice the jury against the defendant.
The prosecution had twelve photographs of the victim lying dead on the Campbell's back porch. The trial judge only allowed two to be introduced into evidence. One, labeled S-5-1, measured 3½ × 4½ inches and showed the victim lying on the porch wearing a blood-soaked tee shirt and pants. The other, labeled S-5-2, measured 3½ × 5¼ inches and depicted the same scene from a distance showing several police officers standing nearby and the victim, a blur, partially covered by a white sheet. Neither of these pictures showed the wounds sustained by the victim.
Three autopsy photographs labeled S-11, 12, and 13, were also admitted into evidence. Each of these photos measured 3 3/8 × 5 inches and showed lacerations, which had been cleaned, of the victim's face alleged to have been made by the pitchfork. S-11 showed the left side of her face, S-12 the right side, and S-13 the front of her face.
Relevant evidence is defined in LSA-R.S. 15:441:
Relevant evidence is that tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent.

*295 Facts necessary to be known to explain a relevant fact, or which support an inference raised by such fact, are admissible.
The trial judge determines whether evidence is relevant by deciding whether it bears a rational connection to a fact at issue in the case. State v. Williams, 341 So.2d 370 (La.1976). Photographs of the body of a victim depicting fatal wounds are generally relevant to prove the corpus delicti; to corroborate other evidence of the manner in which death occurred; to establish the location, severity, and number of wounds; and, to establish the identity of the victim. State v. Cooper, 334 So.2d 211 (La.1976).
The photographs labeled S-5-1 and S-5-2 tended to show that what appeared to be a homicide had been perpetrated and also that the sequence of events occurred as the witnesses described it. The autopsy photographs, S-11, 12, and 13 showed the location, number, and peculiarity of the facial lacerations and tended to show that the victim was struck in the face with a pitchfork. This fact in turn tended to show that he had specific intent to kill her or inflict great bodily injury on her even after shooting her. We feel that the trial judge properly determined that these five photographs were relevant.
Even though a photograph may, strictly speaking, be deemed relevant, if it can be labeled "gruesome" it may not be admitted unless its probative value outweighs any prejudicial effect resulting from its display to the jury. State v. Gilmore, 332 So.2d 789 (La.1976).
The photographs labeled S-5-1 and S-5-2 tended to corroborate the testimony of Mrs. Frank, Charles Frank, Tiffany Campbell, Officer Hargrove, and Lt. Landreneau regarding the location of the victim's body. The fact that the body was located at the rear of the apartment building corroborated the testimony of Tiffany Campbell who saw the defendant chasing the victim in that direction. This fact in turn tended to prove that defendant was the person who stabbed the victim with the pitchfork in the back yard since moments later Tiffany and Mrs. Frank discovered the victim.
Dr. McCormick testified concerning the lacerations on the face of the victim using the photographs S-11, 12, and 13. He testified that they could have been inflicted with a pitchfork. Again, the fact that the victim was chased down and stabbed with a pitchfork by the defendant after he shot her, visited his son, and stood at the front of the apartment for a moment, tends to show that the defendant had the specific intent to kill the victim or inflict great bodily harm upon her. Dr. McCormick also testified that the facial lacerations in and of themselves could have been fatal if not treated and that they had in fact contributed to the victim's loss of blood.
While it is true that many of these facts were placed into evidence through the oral testimony of witnesses, the photographs enabled the jury to visualize the scene and the events surrounding the crime defendant was charged with. The corroborative value of the photographs is plainly evident.
Finally, even though the photographs are not pleasant to view, they cannot be considered "gruesome" or such as would overwhelm reason and lead the jury to convict the defendant without weighing the evidence as a whole. We find the probative value of these photographs outweighed any prejudicial effect on the jury, and accordingly, find no merit in defendant's second assignment of error.
For the assigned reasons we affirm the conviction and sentence of the defendant.
AFFIRMED.
DOMENGEAUX, J., concurs.