721 So.2d 1006 (1998)
STATE of Louisiana, Plaintiff-Appellee,
v.
Perry W. ANDERSON, III, Defendant-Appellant.
No. CR98-492.
Court of Appeal of Louisiana, Third Circuit.
October 28, 1998.
*1007 David Wayne Burton, De Ridder, for State.
C. Kerry Anderson, De Ridder, Leslie R. Leavoy, Jr., Alexandria, for Perry W. Anderson, III.
Before YELVERTON, THIBODEAUX and SAUNDERS, JJ.
THIBODEAUX, Judge.
The defendant, Perry W. "Skip" Anderson III, appeals his conviction and sentence of twenty-two (22) years at hard labor for attempted second degree murder. The defendant shot Jack Beasley on June 29, 1996. A jury found him guilty as charged. On October 3, 1997, the trial judge sentenced Anderson to twenty-two (22) years at hard labor, without benefit of probation, parole or suspension of the sentence.
Anderson assigns three errors in his appeal: improper jury instruction, insufficient evidence, and excessive sentence.
We affirm.

FACTS
Lieutenant Herman Brooks of the DeRidder Police Department received an emergency call on Saturday, June 29, 1996, at 1:28 p.m. from Connie Beasley, the ex-wife of the victim. She sounded stressful and said she was at an address on Glendale Road in DeRidder being held hostage by her landlord who was armed with a shotgun and going to shoot someone. While Lieutenant Brooks was trying to get more information, Ms. Beasley hung up the telephone. Moments later, police received another call from Thomas Cline and, as a result, Lieutenant Brooks dispatched an ambulance to Hickman's Garage on Glendale Road. Tom Cline told Officer Michelle Bennett, the dispatcher on duty, that he saw Skip Anderson shoot another man named Jack.
When the ambulance arrived at Hickman's Garage, the paramedic found the victim, Jack Beasley, had been shot with a shotgun and suffered extensive injuries to the left side of his body. The victim was taken to Beauregard Memorial Hospital and later flown by helicopter to St. Patrick Hospital in Lake Charles for surgery and treatment.
At Hickman's Garage, the police had their first contact with witnesses to the shooting: Ms. Connie Beasley, the ex-wife of the victim; and friends of Ms. Beasley's, Mr. Thomas Cline and his common-law wife, Ms. Carol Nevarez Cline and Mr. Cline's 14-year-old daughter, Jessica Cline. These four persons had witnessed the shooting. Another witness to the shooting was Ms. Mary A. Murr, a neighbor of the defendant.
Ms. Murr testified that she was moving into an apartment across a small field in front of the defendant's duplex on Glendale Road. Ms. Murr did not know any of the other witnesses nor the victim, and she had met the defendant once while she was tending to business at his mother's home. While standing in her living room and looking out the large picture window, she saw two pickup trucks pull up to the duplex where the defendant and Ms. Beasley lived in separate units. A man started to get out of one pickup truck and it appeared to Ms. Murr that the second pickup truck was trying to back up and run over the man. Ms. Murr thought at first that they were playing, but it turned more serious. The man who got out of the truck seemed to freeze for a second. He then ran behind his truck, dove to the ground and rolled several times.
To Ms. Murr, the second truck appeared to have two occupants. It left the scene. The man who fell on the ground did not get up after the second truck left. Ms. Murr thought the man on the ground was her *1008 neighbor, Skip Anderson, and she went over to try to help him. As Ms. Murr exited her door, she saw another man coming out of the apartment and a woman standing in the doorway of the apartment. Ms. Murr had not recognized anyone, at first, and she assumed the man on the ground was Skip Anderson, the defendant. When she saw the other man coming out of the apartment with a rifle or shotgun, she recognized the armed man to be Skip Anderson, the defendant.
Ms. Murr heard the defendant tell the woman standing in the doorway, "Get back in the f_ _ _ _ _ _ house." The woman went inside and closed the door to the apartment. Ms. Murr saw the defendant hold the rifle or shotgun in his hand and walk toward the man on the ground. She could see that the man on the ground was unarmed, and he was obviously injured.
When the defendant reached the man on the ground, he pointed the gun at the man and continuously yelled at him to get up. The victim complied. She saw the defendant holding the gun between his shoulder and hip, and point the gun at the man at all times until after the man got inside the truck. When the man on the ground stood up to get in the truck, Ms. Murr saw blood on him. Even from where she stood, Ms. Murr said it was obvious that the man was hurt. After the man got in the truck, the defendant put the gun down out of a firing position, turned and walked back to the apartment.
When the defendant reentered the rear of the apartment, Connie Beasley, who was inside, hysterically exited the front door and joined the victim in the truck. They left quickly as the defendant came out of the apartment, still armed with the shotgun. He later left in his truck.
Ms. Murr said she never saw the man on the ground make any kind of threatening or angry gesture toward the defendant or anyone else.
The man on the ground that Ms. Murr saw was Jack Beasley who had been divorced from Connie Beasley since October of 1995. They had remained close friends. The victim had never met the defendant until the morning of the shooting.
Connie Beasley met the defendant in January of 1996 while she was working as a waitress at a DeRidder restaurant. The couple began to date, and in April of 1996 the defendant accompanied Connie Beasley and a friend on an Easter weekend visit to Ms. Beasley's mother's home in Missouri.
When Connie Beasley returned to Louisiana, she began a new job as a cook on an offshore diving boat. At the end of May of 1996, while she was offshore, the defendant and one of Ms. Beasley's friends moved her belongings into the apartment adjoining the defendant's apartment. By June 25, 1996, Ms. Beasley quit her job and decided to return to her mother's home in Missouri to determine what she would do with her life. Ms. Beasley was going to store things at Jack Beasley's shed, give her washing machine to her friends, the Clines, and move the rest of her belongings to Missouri. The defendant did not like the idea of Ms. Beasley leaving, and their time together from Wednesday, June 26th, until the shooting grew more and more tense.
Jack Beasley had been over to Connie Beasley's apartment earlier in the week to move the belongings of Ms. Beasley's 21-year-old son. Jack Beasley called Connie Beasley Saturday morning around 10:00 a.m. to check on her and her moving, and he offered to come see her since Connie Beasley sounded upset. When Mr. Beasley arrived, Connie Beasley and the defendant were in the living room of Ms. Beasley's apartment. Ms. Beasley introduced Jack Beasley to the defendant and they engaged in a friendly conversation. While the defendant, the victim, and Connie Beasley visited, Carol Cline arrived. Mr. Beasley helped load some of Ms. Beasley's things into her van. Jack Beasley saw no indications of trouble. However, Connie Beasley was upset and she and Carol Cline left for an hour.
Jack Beasley and the defendant were left alone. Jack Beasley testified that they went into the defendant's apartment. The apartments of Connie Beasley and the defendant were in a duplex and they were separated by a door that was never locked and rarely *1009 closed. The defendant asked Jack Beasley if he wanted a drink. When Jack Beasley had first arrived, the defendant had a mixed drink and Jack Beasley declined the defendant's first offer for a drink, but he accepted the second offer. When the men sat down in the defendant's kitchen, the defendant pulled a small pistol out of his back pocket and told Jack Beasley he did not know what type of person Jack Beasley was and what to expect whenever Jack Beasley got there. He then laid the pistol on the kitchen counter. When the defendant had pulled out the pistol and laid it on the counter, Mr. Beasley told the defendant that he understood the defendant's feeling and told the defendant that he had a pistol in his truck. The pistol, which belonged to Beasley's mother, was wrapped in an old rag and left on the seat or the floorboard of his truck. Jack Beasley never removed the pistol from the truck. At this time on Saturday morning, neither man was angry and the conversation between the defendant and Beasley was casual.
After Connie Beasley and Carol Cline returned, Ms. Beasley and the defendant played a few games of checkers while Mr. Beasley and Carol Cline sat on the sofa and chatted. Jack Beasley was never aware of any threats the defendant made, but Connie Beasley testified that during the checkers' game, the defendant told her, "you better get them out of here; it's going to get ugly." Connie Beasley then had Mr. Beasley and Carol go to her apartment to organize the remaining packing.
While Connie Beasley was in her kitchen, the defendant came in and told her, "get him out of here or I'm going to kill him." Connie Beasley did not believe the defendant and she told him "you're not going to kill anybody." Ms. Beasley then pushed the defendant out of her way and the defendant walked out of her apartment.
Connie Beasley resumed packing shortly after Jack Beasley and Carol Cline left to get Tom Cline and his truck for moving the washing machine. She was confronted in the hallway of the apartment by the defendant who was armed with a shotgun. The defendant hit Connie Beasley in the face with the butt of the shotgun and then he began to hit her head and face with his fists. Photographs of Connie Beasley, taken after she was treated at the hospital, showed the cut under her eye inflicted by the defendant's beating.
The defendant also told Connie Beasley, while he was beating her, "this will teach you to believe me." Connie Beasley asked the defendant why he was doing this to her:
... I asked him what he was doing or why he was doing it; told him he was going to spend time in jail. He said he didn't care. He said I was going to hold Jack's head in my lap and watch him die. He told me if I couldn't be with him, nobody was going to be with me. Heat one point he looked at his hands, looked at my face and said: Now we're both bleeding.
Connie Beasley pushed the barrel of the shotgun away from her face and it discharged, leaving a hole in the wall. She then pulled the gun out of the defendant's hand and threw it on the bedroom floor. Ms. Beasley went into the living room of her apartment and the defendant followed her, carrying the shotgun.
The defendant told Connie Beasley to call the Clines and Jack Beasley and tell them not to come back. Ms. Beasley called Tom Cline's mechanic's shop but the man at the shop told her that Mr. Cline had already left. Connie Beasley told the man to call the police. The defendant was sitting in a rocking chair several steps from the door with a shotgun across his lap. While Connie Beasley was on the phone, the defendant told her, "never mind, they're already here."
Connie Beasley saw the defendant get up out of the rocking chair and go to the door, level the shotgun and shoot. While the defendant was getting up, Connie Beasley called 911 but she hung up when the defendant fired the shotgun. She went to the door, saw Jack Beasley was hurt and that the Clines were leaving and then she locked the door.
The victim, Jack Beasley, testified that he pulled into the driveway of Connie Beasley's apartment and got out to direct the Clines to back their pickup truck to Connie Beasley's apartment when he heard a shotgun being *1010 shifted. When the victim heard the shotgun shift, he turned around and saw the defendant aiming a shotgun at him. The victim tried to run and get behind his truck, but the defendant shot him on his left backside injuring him from slightly below his armpit to just below his left hip. The defendant then walked around to Jack Beasley, pointed the shotgun at him and told Jack Beasley to either get up and leave or "he'd blow my f_ _ _ _ _ _ head off." Mr. Beasley recalled nothing else except a few moments in an ambulance and waking up in the intensive care unit in a hospital in Lake Charles.
Tom Cline, Carol Cline, and Jessica Cline, the 14-year-old daughter of Tom Cline, all testified that they were not aware of any trouble at the apartment of Connie Beasley. When they pulled into the driveway, they saw the defendant shoot Jack Beasley with the shotgun, and they fled to Hickman's Garage. The defendant has expended considerable effort mentioning the fact that Tom and Carol Cline have prior felony convictions in California. However, their versions of the shooting are consistent with that of Connie Beasley; the victim, Jack Beasley; Jessica Cline; and, Ms. Mary Murr.
The defendant apparently went to his brother, who is an attorney, and he later surrendered to the police. Several police officers testified they all had known the defendant for many years. Neither Detective Robert McCullough nor Detective John Rainwater, who came in contact with the defendant after the shooting and performed the atomic absorption tests, considered the defendant intoxicated. The defendant did not smell of alcohol nor did he have any other objective manifestations of intoxication.
At the conclusion of the trial, the jury found the defendant guilty as charged.

ASSIGNMENT OF ERROR NO. 1
The defendant contends that the trial court erred in giving a jury instruction that placed the burden of proof of intoxication and selfdefense upon the defendant.
In non-homicide cases, such as attempted second degree murder, the defendant must carry the burden of proving selfdefense by a preponderance of the evidence. State v. Hall, 606 So.2d 972 (La.App. 3 Cir. 1992), writ denied, 93-0051 (La.11/11/94); 644 So.2d 385; see also State v. Joubert, 97-1093 (La.App. 3 Cir. 2/4/98); 705 So.2d 1295. When a defendant claims the intoxication defense, the burden is upon the defendant to prove the existence of such a state of intoxication at the time of the offense that he could not form specific intent to commit the crime. State v. Smith, 95-1171 (La.App. 3 Cir. 4/24/96); 677 So.2d 458 citing State v. Tezeno, 507 So.2d 291 (La.App. 3 Cir.1987). Thus, the trial court did not err in giving jury instructions that placed the burden of proving intoxication and self-defense upon the defendant.

ASSIGNMENT OF ERROR NO. 2
The defendant next contends the evidence was insufficient to prove his guilt beyond a reasonable doubt. The defendant again complains that he should not be required to carry any burden of proof, particularly since he exercised his constitutional right to remain silent and there were no independent witnesses.[1]
As was recognized in State v. Barnes, 491 So.2d 42 (La.App. 5 Cir.1986), facts which would establish an affirmative defense such as self-defense or intoxication are usually in the control of or at the disposal of the defendant. Thus, since the defendant would be in a better position to know subjective facts, the courts have not found it unfair to place a burden upon the defendant to prove an affirmative defense by a preponderance of the evidence. State v. Barnes, Id.
Louisiana Revised Statute 14:19 provides:
The use of force or violence upon the person of another is justifiable, when committed *1011 for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide.
The issue of self-defense requires a dual inquiry: (1) an objective inquiry into whether the force used was reasonable under the circumstances; (2) a subjective inquiry into whether the force was apparently necessary. State v. Hall, 606 So.2d 972. In the present case, there was no evidence that the victim was going to commit a forcible offense against the defendant. There was also no evidence of criminal trespass. The victim was simply coming to help his ex-wife move her things out of her apartment. The defendant presented nothing to support his claim of self-defense, other than to raise questions about what had happened while he and the victim were alone for an hour.
The defendant contends that the Clines, Connie Beasley and the victim cannot be believed. However, the jury chose to believe these witnesses and such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness.
In State v. McKeever, 407 So.2d 662 (La. 1981), the Louisiana Supreme Court held that where the jury has heard all the evidence and received the proper instructions from the trial judge regarding an intoxication defense, its verdict should not be impinged upon absent an abuse of the jury's discretion. State v. Salas Martinez, 524 So.2d 871 (La. App. 3 Cir.), writ denied, 525 So.2d 1047 (La.1988). The jury heard testimony about the defendant having one mixed drink when the victim arrived midmorning on Saturday, and that the defendant had at least one other mixed drink within an hour. However, the state introduced the testimony of two detectives who were with the defendant after the shooting when he was being booked into the jail and while he was being subjected to an atomic absorption test. Both detectives clearly stated that they could not smell alcohol on the defendant and that the defendant had no manifestations of intoxication. These same officers were experienced in dealing with intoxicated individuals and if they had suspected the defendant was intoxicated, they would have requested the appropriate tests to determine the degree of intoxication. The jury did not abuse its discretion in rejecting the intoxication defense.
When the attempt statute is invoked and the charge is attempted second degree murder, it is required that the person have the specific intent to kill a human being. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10. The defendant's statements shortly before the shooting, threatening to kill the victim, and his statements to Connie Beasley while he beat her indicated that the defendant desired the criminal consequences that would follow his acts. That the defendant actively desired to kill the victim is evident from the defendant shooting the unarmed victim. Thus, the state proved beyond a reasonable doubt that the defendant committed attempted second degree murder of Jack Beasley.

ASSIGNMENT OF ERROR NO. 3
The defendant's final assignment of error is that his sentence is excessive.
The jury convicted the defendant of attempted second degree murder, a violation of La.R.S. 14:27 and 14:30.1. The statutory range of sentence for this crime is not less than ten (10) years and not more than fifty (50) years at hard labor without benefit of parole, probation or suspension of sentence. La.R.S. 14:27(D)(1). The trial judge sentenced the defendant to serve twenty-two (22) years at hard labor without benefit of parole, probation or suspension of sentence. The trial judge informed the defendant that pursuant to La.R.S. 15:571.3(B), the defendant is eligible for diminution of his sentence for good behavior and thus he could be released from custody after serving one-half, or eleven years, of his sentence.
*1012 The maximum possible sentence that could have been imposed for the conviction was fifty years without benefit of parole, probation or suspension of sentence. The defendant's sentence is less than one-half the maximum possible sentence. It may appear harsh since the defendant is a first offender. However, in State v. Cook, 95-2784 (La.5/31/96); 674 So.2d 957, the Louisiana Supreme Court emphasized that the only relevant question on review of a sentence is whether the trial court abused its broad sentencing discretion, and not whether another sentence might be more appropriate. Id. at 959.
To constitute an excessive sentence this court must find the penalty imposed is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals; and, therefore, it is nothing more than needless imposition of pain and suffering. The trial judge is given wide discretion in imposing a sentence, and a sentence imposed within statutory limits will not be deemed excessive in the absence of manifest abuse of discretion.
In his four-page written reasons for sentencing, the trial judge stated that there was no evidence of any provocation by the victim, no evidence of self-defense, and the evidence of drinking by the defendant did not establish intoxication. Instead, the evidence showed that the defendant waited for the victim to return to Ms. Beasley's apartment after expressing his intent to kill Jack Beasley. After shooting the victim with a 12-gauge shotgun loaded with buckshot, the defendant forced the victim to get up and leave, without offering any assistance to the wounded man. The shotgun blast severely injured the victim who spent thirty days in the hospital, has had three major surgeries and two minor surgeries, and has sustained serious economic losses that are not covered by insurance. The victim still has several buckshot pellets lodge in the pericardium, the membrane surrounding his heart; the surgeon testified at trial that the risk from surgical removal was high and the pellets were causing no additional injuries. According to the PSI report, the defendant has been involved in three prior incidents involving shootings but no arrests or prosecutions resulted. The trial judge found the defendant has shown no remorse for his actions or for the suffering he inflicted upon the victim. The trial judge also found the defendant had a "proclivity to violence" that convinced him the defendant needed a sentence substantially greater that the minimum.
Based upon the facts of this case, the personal history of the defendant as outlined in the trial judge's written reasons for sentencing, and the PSI report, the sentence imposed is not unconstitutionally excessive.

CONCLUSION
Based on the foregoing, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Actually, there was an independent witness to the shooting, Mary A. Murr. Ms. Murr's testimony has already been summarized. She testified she never saw the victim make any angry or threatening move toward the defendant. Also, the events she witnessed clearly established that as soon as the unarmed victim stepped out of his truck, the defendant shot him while the victim was trying to run for cover behind his truck.