|,YELVERTON, Judge.
The Juvenile, M.N.H., was adjudicated a delinquent based on a charge of second degree battery, a violation of Louisiana Revised Statute 14:34.1, which carries a maximum imprisonment of five years. On March 2, 2001, M.N.H. and the victim, J.B., were involved in an altercation in the *1151 locker room at Natchitoches Central High School. Although the victim, J.B., never hit M.N.H. with his fist, he probably started the altercation. The victim either bumped M.N.H. with his chest, or pushed him with his fingertips. M.N.H. then hit J.B. with his fist and knocked him down and out. While J.B. lay on the floor incapacitated, M.N.H. straddled him and hit him several times in the face with his fist. The victim suffered severe injuries. The trial judge found that when M.N.H. straddled J.B. on the floor and began to hit him with his fists, M.N.H. became the aggressor. The trial judge found a second degree battery.
The trial judge sentenced the Juvenile to serve two years with the Louisiana Department of Corrections with a recommendation that he be enrolled in the intensive impact incarceration or “boot camp” program. His counsel filed a motion to reconsider sentence which was denied.
M.N.H. appeals assigning four errors. Assignments of error Nos. 1 and 2 relate to the adjudication. Assignments of error Nos. 3 and 4 relate to the disposition.
ASSIGNMENT OF ERROR NO. 1
The Juvenile claims the trial judge erred in finding he became the “second aggressor” in the altercation with J.B., contending he did not unreasonably exceed the force with which he was met. The Juvenile denies that, by continuing to swing after the first punch, he became the aggressor. He argues that the fight was over quickly Land that he stopped as soon as he realized J.B. was not fighting back. He takes issue with the trial judge’s finding that he had an opportunity to retreat after the first blow; he claims he continued to hit J.B. only to prevent being hit. The Juvenile argues that he responded to a battery with a battery and the time it took him to realize J.B. was incapacitated was not unreasonable. The Juvenile contends he proved self-defense without unreasonable use of force.
At the adjudication proceeding, J.B. testified that on March 2, 2001, in the locker room after baseball practice, he and M.N.H. had words about a girl. J.B. said he approached M.N.H. and put his hands up like he was not going to fight him, and that was all he could remember. He did not remember being punched and just remembered waking up in the hospital in Shreveport.
M.N.H. testified that, on the day of the fight, he was in the locker room putting things in his locker and he saw J.B. was about to leave. He asked J.B. to come talk to him. He took J.B. into the bathroom/shower area because there were still people in the locker room and he did not want them to encourage a fight. M.N.H. testified that he intended to ask J.B. why he had been talking about him. J.B. set his bag down, and they were standing a couple of feet apart. M.N.H. asked J.B. why he was still talking about him and why he was “trying to put [M.N.H.] down so he could be with [the girl].” M.N.H. testified that they were talking in a low voice and “had moved closer together but just to talk.”
They then separated briefly but resumed arguing, and M.N.H. testified what happened after that:
A And I was like thinking in my head the whole time, you know, this is real. If he touches me, you know, I done warned him, I’m going to hit him. And when he bumped me, I mean, I just felt threatened like he was 13about to hit me and he pushed me. So that was a big step, you know, from arguing. And when he pushed me, I just ... I hit him. And when I hit him the first time, you know, I was thinking either stop ... you know, keep hitting him or get hit. *1152 And it was over so fast. When I saw that he was, you know, wasn’t fighting back or wasn’t trying to fight me, I stopped and got up and that’s when [a classmate witness] pushed me towards the door.
Following adjudication, the trial judge gave detailed reasons for his ruling. He stated that he was impressed by the testimony of the three classmates who witnessed the matter, and he relied on their testimony. He stated that J.B. possibly bumped M.N.H. with his chest. The judge said there was no testimony that J.B. ever used his fists at anytime. He said that right after the “bump,” M.N.H. hit J.B. with his right hand with such force that J.B.’s body was propelled backward and M.N.H.’s body was propelled forward into some adjoining lockers, and the back of J.B.’s head was cut. The judge said that at that point in time, if that had been all that occurred, this would have been a typical fight on a high school campus over a girl. But it proceeded forward, and after that, the trial judge concluded that M.N.H. became the aggressor. He based this on the testimony of the three witnesses. He found that after J.B. was on his back on the floor, unconscious and incapacitated, M.N.H. straddled him, and proceeded to repeatedly pummel him with his right fist, breaking his jaw, breaking his left orbital socket, swelling his left eye shut, and knocking out eight teeth. The serious injuries could not have been the result of the single blow delivered while they were standing up. The judge recalled that one of the three witnesses said M.N.H. hit J.B. at least three times after he was down. Another saw M.N.H. strike the victim five to ten times repeatedly. The third saw M.N.H. get on top of him and hit him several times in the face. The judge specifically found that, after the original blow, which was delivered while they were both standing up, J.B. was in no shape or condition to Ufight and that he was basically incapacitated from that time on. We have carefully examined the transcribed testimony of all witnesses and find that the trial judge accurately related the facts to which they testified.
The witnesses stated that after J.B. fell to the floor following the first blow, he did not fight back and did not move. One of the witnesses said that the entire time J.B. was on the floor he was not moving at all; he was on his back with his arms out from his body. Another witness said that he called out to M.N.H. twice. The witness went over and tried to push M.N.H. off of J.B. M.N.H. was getting off of his knees, but he was still “throwing licks”, and the witness shoved M.N.H. off of J.B. All of the blows were to J.B.’s head and face.
Louisiana Revised Statute 14:19 provides:
The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person’s lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide.
“The issue of self-defense requires a dual inquiry: (1) an objective inquiry into whether the force used was reasonable under the circumstances; (2) a subjective inquiry into whether the force was apparently necessary.” State v. Anderson, 98-492, p. 10 (La.App. 3 Cir. 10/28/98); 721 So.2d 1006, 1011, writ denied, 98-2976 (La.3/19/99); 739 So.2d 781 (citing State v. Hall, 606 So.2d 972 (La.App. 3 Cir.1992), writ denied, 93-51 (La. 11/11/94); 644 So.2d 385).
The issue of whether a defendant became the aggressor was squarely before the court in the following two cases. In *1153 State v. Patton, 479 So.2d 625 (La.App. 1 Cir.1985), the defendant and the victim gave conflicting accounts of who precipitated the | ^attack. The defendant’s story was that the victim attacked him first and that he disarmed the victim. It was after he disarmed the victim that he cut the victim twice. The court affirmed a conviction for aggravated battery. It found that the Defendant’s use of force in stabbing the victim was neither reasonable nor apparently necessary. It noted that, assuming the defendant disarmed the victim, he lost the right to claim self-defense and became the aggressor.
In State v. Williams, 33,581 (La.App. 2 Cir. 6/21/00); 764 So.2d 1164, the defendant persisted in prolonging a conflict with the victim after the victim attempted to leave the scene and told the defendant the fight was over. The defendant kicked and hit the victim while he was on the ground. The court noted that even if the victim had been the initial aggressor, the fight ended when he so informed the defendant and expressed his desire to withdraw. Once that occurred, the defendant did not need to defend himself and became the aggressor. The court upheld the defendant’s aggravated battery conviction.
Similarly, as did the courts in the above decisions, the trial judge in the present case correctly found that M.N.H. became the “second aggressor.” Even assuming J.B. was the initial aggressor, the testimony presented at the hearing unanimously established that J.B. did not attempt to fight back after M.N.H. threw the first punch and J.B. fell to the floor. Thus, M.N.H.’s actions beyond that point, which included straddling J.B. and continuing to deliver blows to his head, were the unreasonable and unnecessary use of force.
This assignment of error has no merit.
I «ASSIGNMENT OF ERROR NO. 2
One of the elements of second degree battery, Louisiana Revised Statute 14:34.1, is the infliction of serious bodily injury. The statute defines serious bodily injury for its purposes to mean “bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.” Id.
The trial judge found that the State had proved this element. To establish serious bodily injury, the State relied principally upon photographs of the victim and the testimony of an oral surgeon.
Sergeant Randall Williams of the Natch-itoches Police Department was on duty as a school resource officer at Natchitoches Central High School on March 2, 2001. Approximately two and one-half hours after the incident, Sergeant Williams saw the victim at the hospital, where he took photographs which were introduced into evidence.
These photographs are the subject of this assignment of error. This assignment of error is two-pronged. M.N.H. first asks us to find error in the trial judge’s admission of the photographs, claiming that they were “overly-prejudicial” because they were “the bloody (pretreatment) photographs of the [victim].” Second, he claims that the trial judge was in fact unduly prejudiced by the photographs, evidenced by the trial judge’s many references to them and his use of them when he questioned witnesses in the case. Expanding on the second prong of this assignment, M.N.H. argues that the photographs were an “insurmountable obstacle” to the judge’s |7objectivity and served as a basis for the improper finding of guilt as well as handing down an excessive sentence.
*1154 We find no merit to these arguments. The accuracy of the photographs have never been questioned. They were clearly admissible and were directed to the State’s burden of proving serious bodily injury.
The photographs were also relevant to support the testimony of Dr. Amir Mara-shi, another State witness. An oral surgeon, Dr. Marashi testified that he examined and treated the victim. He testified that the injuries he observed on the victim were consistent with blows from a fist. Dr. Marashi found the victim had swelling and eechymosis around his left eye, fractures of the alveolus of both upper and lower jaws, a lot of soft tissue injuries around his lips, and the loss of four teeth with another four teeth being attached only to soft tissue. Dr. Marashi understood that the four missing teeth were left at the scene. Dr. Marashi explained that bones were crushed and “it was many pieces in the alveolus,” the gum tissue covering the alveolus. The victim also had a non-displaced fracture of the lateral rim of his orbit, the area near the eye socket. Dr. Marashi testified he later debrided the area, removed the four loose teeth because they were not salvageable, removed pieces of bone, and closed the gums over the remaining bone.
These photographs were visual depictions of the evidence presented in the case and were no more prejudicial than any other evidence tending to prove guilt. The trial judge did not err in admitting them in evidence. The judge’s characterization of the event as a “vicious attack” and “shocking” was not exaggerated, nor does it support the contention that he lost his objectivity at either the adjudication or disposition proceeding. This assignment of error has no merit.
I ^ASSIGNMENTS OF ERROR NOS. 3 & 4
The Juvenile maintains that the trial judge failed to properly consider the dispo-sitional guidelines contained in Louisiana Children’s Code Article 901(A)-(B) resulting in an excessive sentence. We will consider these two assignments together. M.N.H. points to testimony he claims the trial judge failed to consider which was favorable to him. He also points to various factors which he claimed prejudiced the judge against him, and which the trial judge should not have considered. Louisiana Children’s Code Article 901(A)-(B) provides:
In considering dispositional options, the court shall not remove a child from the custody of his parents unless his welfare or the safety and protection of the public cannot, in the opinion of the court, be adequately safeguarded without such removal.
The court should impose the least restrictive disposition authorized by Articles 897 through 900 of this Title which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interest of society.
At the close of the disposition hearing, the judge imposed a sentence of two years with the Louisiana Department of Corrections with the recommendation that the Juvenile be enrolled in the intensive impact incarceration or “boot camp” program.
When an excessive disposition is complained of in a juvenile proceeding, the record must be reviewed to determine whether the juvenile court imposed the least restrictive disposition consistent with the circumstances of the case, the child’s needs, and the best interest of society. State ex. rel. K.H., 98-632 (La.App. 5 Cir. 12/16/98); 725 So.2d 583; State in Interest *1155 of T.L., 28,564 (La.App. 2 Cir. 5/8/96); 674 So.2d 1122. In any review for excessiveness, the appellate court must first ascertain whether the lower tribunal took cognizance of the general guidelines provided for | ¡juvenile cases in Louisiana Children’s Code Article 901, and whether the record reflects an adequate factual basis for the commitment imposed. State in Interest of T.L., 674 So.2d 1122. “Following that determination, the reviewing court need only explore for constitutional excessiveness in light of the circumstances of the case and the background of the juvenile.” Id. at 1124. “[AJbsent a showing of manifest abuse of the wide discretion afforded in such cases, a disposition will not be set aside as constitutionally excessive.” Id.
At the dispositional hearing, the Juvenile was fully accorded his due process right to rebut information in the pre-dispositional investigation report that might have adversely affected the sentencing determination. Melissa Trosclair of the Natchitoches Office of Youth Development, Department of Safety and Corrections, prepared the predisposition investigation report and made disposition recommendations. The Juvenile attacked the report, and on appeal maintains that the report wrongly influenced the judge’s objectivity. One such improper influence is said to have been Ms. Trosclair’s “flagrant discussion of rumors.” This was a reference in the report to community attitudes regarding this case and rumored fears that the Juvenile would receive a “slap on the hand.” The trial judge was aware of M.N.H.’s objection to the inclusion of this information in the report and made assurances at the disposition that he would not be affected by them.
The trial judge also indicated at the dispositional hearing that he disregarded the testimony of a state psychologist who had drafted a report without personally interviewing the Juvenile. This was in response to another objection that the Juvenile raised regarding the predisposition report. Also, in his reasons for disposition, the trial judge indicated that he had taken into consideration all of the mitigating Imcircumstances, including the Juvenile’s reputation, his grades, his remorse, and the absence of a prior criminal adjudication. The judge declined to consider that the Juvenile had been arrested for fighting two years earlier. It was mainly because of the shocking and unrelenting nature of the beating that the judge concluded that the public could not be adequately safeguarded without the Juvenile’s removal, and that to do otherwise would deprecate the seriousness of the crime. We find that the trial judge took cognizance of the guidelines provided for juvenile cases and that the record reflects an adequate factual basis for the commitment imposed. We can find no abuse of discretion in the trial judge’s disposition.
ERRORS PATENT
We conduct error patent reviews in juvenile criminal appeals. State in Interest of T.T., 96-6 (La.App. 3 Cir. 5/8/96); 677 So.2d 466. There are three errors patent.
First, the Juvenile’s adjudication was on May 7, 2001. His disposition hearing began on June 21, 2001, and concluded on June 29, 2001, more than thirty days after the adjudication hearing. Louisiana Children’s Code Article 892 requires that the disposition hearing must be conducted within thirty days after the adjudication, but that such period may be extended for good cause.
The failure to conduct a timely disposition hearing is an error patent. However, the delay was the result of the Juvenile’s objection to the predisposition report. This was good cause for the delay.
*1156 Second, the Juvenile was not informed of the two-year prescriptive period for filing post-conviction relief as required by Louisiana Code of Criminal Procedure Article 930.8(C). This notice should have been given. State in Interest of J.C.G., 97-1044 (La.App. 3 Cir. 2/4/98); 706 So.2d 1081. We direct the trial judge to inform the Juvenile of the provisions of Article 930.8 by sending appropriate written notice to the Juvenile within ten days of the rendition of this opinion and to file written proof that the Juvenile received the notice in the record of the proceedings. See State v. Fontenot, 616 So.2d 1353 (La.App. 3 Cir.), writ denied, 623 So.2d 1334 (La.1993); State v. Courtney, 99-1700 (La.App. 3 Cir. 5/3/00); 761 So.2d 112.
Third, the Juvenile was not given credit for time served in secure detention prior to imposition of disposition. Louisiana Children’s Code Article 898(A) provides in pertinent part: “The court shall give a child credit for time spent in secure detention prior to the imposition of disposition.” Louisiana Children’s Code Article 898(A) was not amended, however, so this court has continued recognizing the trial court’s failure to give credit for time served in juvenile cases. Thus, we amend the disposition to reflect that the Juvenile is 'given credit for time he served in secure detention prior to imposition of disposition. See La.Ch.Code art. 104; La.Code Crim.P. art. 882(A). Further, upon remand, we will instruct the trial judge to amend the commitment and minute entry of the disposition to reflect credit for time served in conformity with Article 898(A).
JUDGMENT
The adjudication of delinquency is upheld. The sentence is affirmed. The matter is remanded, and the trial judge is directed to inform the Juvenile of the provisions of Article 930.8 by sending appropriate written notice to the Juvenile within ten days of the rendition of this opinion and judgment and to file written proof that the Juvenile received the notice in the record of the proceeding below. Also, the h ¿trial judge is instructed to amend the commitment and minute entry of the disposition to reflect credit for time served in conformity with Article 898(A).
ADJUDICATION AND DISPOSITION AFFIRMED; REMANDED.