771 So.2d 131 (2000)
STATE of Louisiana
v.
Richard J. SCHMIDT.
No. 99-1412.
Court of Appeal of Louisiana, Third Circuit.
July 26, 2000.
Rehearing Denied September 27, 2000.
*134 Michael Harson, District Attorney, Keith A. Stutes, Assistant District Attorney, Lafayette, LA, Counsel for Plaintiff/Appellee.
Michael S. Fawer, Covington, LA, Gerald J. Block, Lafayette, LA, William R. Campbell, Herbert V. Larson, Jr., New Orleans, LA, Thomas E. Guilbeau, Lafayette, LA, Counsel for Defendant/Appellant.
(Court composed of Judge HENRY L. YELVERTON, Judge BILLIE COLOMBARO WOODARD, Judge GLENN B. GREMILLION).
*135 GREMILLION, Judge.
In this case, the defendant, Richard J. Schmidt, appeals his conviction and sentence of fifty years at hard labor for attempted second degree murder. For the following reasons, we affirm.

FACTS
The State charged Defendant, a medical doctor specializing in gastroenterology, with the attempted second degree murder of Janice Trahan, a nurse, alleging that he committed the crime on August 4, 1994, by injecting the human immunodeficiency virus (HIV) into Trahan under the guise of giving her a Vitamin B-12 shot. HIV is the virus which causes acquired immune deficiency syndrome (AIDS), a disease for which there is no cure and which is ultimately fatal.[1] Trahan testified that she is now HIV-positive and suffers from Hepatitis C, and that she became infected by those diseases when Defendant injected those viruses into her on August 4, 1994. She initially sought medical attention for symptoms of a viral infection on August 16, 1994, and was informed she was HIV positive on January 3, 1995.
The evidence at trial established that Defendant and Trahan were engaged in an extramarital affair for over ten years at the time the instant offense was committed. When they began their affair, both Defendant and Trahan were married. Trahan divorced her husband; however, Defendant's promises to divorce his wife were never fulfilled. According to the evidence, Trahan tried to end their affair many times, but Defendant either persuaded or coerced her into returning to him each time. The evidence also reflected that Defendant threatened or discouraged Trahan's other would-be suitors.
The evidence revealed that sex was the primary focus when Defendant and Trahan were together. Defendant did not like using condoms nor did he like Trahan using a diaphragm for birth control. According to Trahan, she did not take birth control pills because they gave her migraine headaches. As a result, she became pregnant four times by Defendant and, on three of those occasions, he pressured her into having abortions to terminate her pregnancies.[2] She did not terminate one of her pregnancies by Defendant, and, in March 1991, she gave birth to their son, J.T.[3] Their relationship continued until July 19, 1994, when Trahan told Defendant their affair was over after learning that he had returned to his wife.
In her testimony, Trahan described the mysterious circumstances surrounding the "shot in the dark" she received from Defendant. In early July 1994, Defendant gave Trahan a series of three Vitamin B-12 shots. The night of August 4, 1994, Defendant called Trahan and told her he was coming over to give her another B-12 shot. Trahan had not seen Defendant since the day of their break-up on July 19, 1994, and was asleep in bed with three-year-old J.T. when Defendant arrived. Trahan explained that she told him she did not want a shot at that time, but would rather it be given the next morning. Defendant, nonetheless, came around the bed and, before she could react, injected her in the arm. None of the previous B-12 injections had hurt, but Trahan testified that this shot was very painful, hurting all the way down her arm. Defendant then left suddenly, telling Trahan that he had to go *136 to the emergency room of Hamilton Medical Center.
The shot continued hurting Trahan that night, and she thought she would have to go to the hospital to have it examined by a doctor. She called the emergency room at Hamilton Medical Center, but learned that Defendant was not there. Trahan then paged Defendant and, according to her, he returned the page from his office. She confronted him with the lie regarding his whereabouts, to which he responded that he had been on the third floor of the hospital. Trahan claims she then told Defendant about the pain she was experiencing from the injection and he apologized and told her he would not give her another "shot in the dark."
The next day, Trahan testified that she told Meredith Poche, a nurse with whom she worked in the Intensive Care Unit of Lafayette General Hospital, about the unusual and painful injection. Poche testified that Trahan told her about Defendant's suspicious behavior and that she suspected that the injection was not a B-12 shot. According to Poche, Trahan told her because she wanted someone to know she had received the injection.
Trahan began suffering flu-like symptoms in the weeks following the August 4, 1994 "shot in the dark." According to Trahan, she continued seeing Defendant professionally after August 4, 1994, and, on August 12, 1994, he gave her a prescription for blood work. Trahan testified that Defendant told her that her blood work was normal, except that her "white count was a little low," and not to worry because she probably had a viral infection.
The first doctor, other than Defendant, to treat Trahan was Dr. Donner Mizelle, an optometrist, who had treated her since 1989. At her August 16, 1994 examination with Dr. Mizelle, Trahan complained of pain in her eyes, fatigue, and swelling of the lymph nodes in her head and neck. On August 29, 1994, Trahan was seen by Dr. Robert Martinez, a neurologist and sleep disorder specialist. She described having a migraine headache in July, as well as another more severe headache the weekend of August 27th and 28th. Dr. Martinez noticed that she had swollen lymph nodes in her head and neck. Trahan also complained that her throat was sore and had ulcers. Since these were classic symptoms of a viral infection, Dr. Martinez referred her to Dr. Bradley Chastant, an ear, nose, and throat specialist.
Dr. Chastant saw Trahan immediately and ordered a lymph node biopsy, which was performed on September 16, 1994. The results indicated a viral reactive infection. Because lymphoma, a malignancy of the lymph nodes, was a possibility, Trahan was referred to Dr. Luis Mesa, a cancer specialist. Dr. Chastant relayed his findings to both Dr. Martinez and Defendant. Dr. Chastant recalled speaking with Defendant about Trahan's condition and later sending him a copy of his report.
Dr. Mesa first examined Trahan in the hospital on September 16, 1994. Before Dr. Mesa saw Trahan, Defendant called and spoke with him about her condition. According to Dr. Mesa, Defendant suspected Trahan had a viral infection. However, Dr. Mesa testified that Defendant told him that an HIV test was performed on Trahan before September 1994, and that it was negative. As a result of the conversation, Dr. Mesa did not order further HIV tests, but noted the negative HIV test result in his report.
On November 21, 1994, Trahan saw her dentist, Dr. Neil Bernard. Dr. Bernard noticed that Trahan's gums were inflamed, her lymph nodes were swollen, and her white blood cell count was elevated.
Finally, Trahan went to her obstetrician-gynecologist, Dr. Wayne Daigle, for her annual checkup. Dr. Daigle cared for her during her pregnancy with J.T. and had previously consulted with her in July 1994 about headaches resulting from her use of birth control pills. On December 15, 1994, Dr. Daigle noticed that Trahan had lost *137 weight, suffered malaise, and had other symptoms indicative of a viral infection. She told Dr. Daigle that Defendant had done lab work on her, but Dr. Daigle decided to order new tests. At first, Dr. Daigle suspected Hepatitis A or B, but, as an afterthought, he added an HIV test just to be thorough. On December 20, 1994, Dr. Daigle was informed by the testing laboratory that Trahan was HIV positive. He waited until after the Christmas/New Year holidays to tell her the test results. When Dr. Daigle told Trahan that she was HIV positive, she asked him to inform Defendant. Since Defendant had office space in the same building as Dr. Daigle, Dr. Daigle called Defendant and met him at the back door of their building. Dr. Daigle testified that Defendant appeared shocked when he was first informed that Trahan was HIV positive, but was adamant that he knew he was not HIV positive, that he felt fine, and that he did not need to be tested.
Dr. Daigle knew that Defendant and Trahan had been involved in a ten-year relationship and that sexual intercourse was a common way HIV was spread. As such, Dr. Daigle presumed that Defendant was HIV positive also. When Defendant telephoned Dr. Daigle at the hospital later that evening, Dr. Daigle offered to have him tested for HIV anonymously through his office. Defendant again declined, saying he saw no reason for an HIV test. Dr. Daigle testified that he also told Defendant that the Louisiana State Board of Medical Examiners would eventually be notified that he was potentially HIV positive; however, Defendant maintained that he felt no need to be screened for HIV.
Dr. Daigle further testified that, during the telephone conversation, Defendant suggested the possibility that Trahan was infected with the HIV virus either through her contacts with AIDS patients at work, from her other sexual partners, or from dirty instruments used at the abortion clinics where she underwent abortions. Dr. Daigle responded that, since Trahan was a heterosexual female and not an intravenous drug abuser, he did not believe she was infected with HIV by the means suggested by Defendant, but that she had been infected by sexual intercourse. Dr. Daigle eventually referred her back to Dr. Mesa.
Also treating Trahan was Dr. Ernest Wong, a pulmonologist and one of the first physicians in Lafayette to specialize in the treatment of HIV and AIDS. His specialization in this field began in 1983, because most patients who were suffering from AIDS experienced respiratory problems and were referred to him for treatment. Dr. Wong testified that HIV is transmitted to a person by sexual intercourse, through blood products, or intravenous injections, and that HIV is still considered a fatal disease for which there is no cure. Dr. Wong first saw Trahan as a patient on January 23, 1995. While taking her history, Trahan told him about the suspicious shot given to her by Defendant in the first week of August 1994, and that Defendant ordered blood work for her in September 1994. Dr. Wong noted that no HIV test was performed on that blood work. He further testified that Trahan was exhibiting the classic symptoms of an HIV infection by September 1994. During his testimony, Dr. Wong also noted that Trahan was a regular blood donor and had made a blood donation in April 1994. According to Dr. Wong, a test of that blood donation was negative for both HIV and Hepatitis C. Based upon the phase of the victim's infection, Dr. Wong estimated that Trahan had been infected with HIV in the first week of August 1994.
Dr. Wong also treated D.M.,[4] the person whose blood was believed to be the source of the HIV injected into Trahan. Dr. Wong treated both D.M. and Trahan for their HIV with the drug AZT. Defendant argued that D.M.'s HIV is considered AZT-sensitive, while Trahan's HIV is considered *138 AZT-resistant. He, therefore, claimed that this distinction refuted the State's assertion that he used D.M.'s HIV-tainted blood to infect Trahan. Dr. Wong, however, explained that such a conclusion is not entirely correct. According to Dr. Wong, D.M.'s HIV is AZT-sensitive because his T-cell levels, an indication of how the virus is progressing, would decline when he took AZT in combination with other drugs, and those other drugs may have increased the effectiveness of the AZT. Dr. Wong further testified that Trahan also had a "nice drop" in her T-cells when she took AZT in combination with other drugs.
The State called five of Trahan's former sexual partners as witnesses. The men testified that they were tested recently for HIV and that their results were negative. The State and Defendant also stipulated that one other sexual partner of Trahan was HIV negative. Another man who dated her also testified that they never had sexual contact.
After Trahan learned she was HIV positive, she informed the hospital where she worked, as well as other authorities, about her condition. According to Julie Sellers, the Infection Control Coordinator for Lafayette General Hospital, who monitored exposures among employees to infectious diseases such as HIV, Trahan was not in an "exposure prone" job such as surgery, nor was she exposed to HIV patients. Further, hospital records showed that Trahan had no reported incidents of exposure, though she told Sellers of an incident in 1985, in which an AIDS patient coughed on her.
Throughout the trial, Defendant emphasized the fact that Sellers' notes show that Trahan revealed only three of her sexual partners. However, Sellers testified that she did not ask Trahan about the number and identity of her sexual partners, as that did not appear to have been part of her duties as Infection Control Coordinator. Instead, Sellers recounted that Trahan mentioned some names during their counseling sessions as if she were "thinking out loud," even though she did not question her about her sexual partners.
After Trahan filed a criminal complaint against Defendant, Captain James Craft, then a detective with the Lafayette Police Department, led the investigation into the complaint. He met Trahan at the District Attorney's Office and, based upon information he received, obtained search warrants for Defendant's office and home, as well as for a sample of Defendant's blood.
The search warrants were executed on July 13, 1995, at Defendant's office. Detective Craft waited until Defendant saw all of his patients and closed his office for the day before conducting the search. When Defendant began asking questions and making statements, Detective Craft informed him of his Miranda rights. Defendant told Detective Craft that he was HIV negative and that forcing him to be tested would ruin his medical practice. When Detective Craft asked Defendant for the file on Trahan, Defendant told him that he had last treated her in 1990. However, Defendant's medical file on Trahan indicated that he received her blood tests results as late as August 1994.
The search of Defendant's office produced two spiral notebooks in the procedure room where blood and other patient samples were drawn. Defendant called these notebooks "jot books." One of the jot books seized had entries for blood draws from March 1, 1993 to December 10, 1993. Another jot book contained the same type of entries from August 15, 1994, to July 13, 1995, the date of the search. When Detective Craft asked Defendant for the notebook containing the entries from December 11, 1993, to August 14, 1994, Defendant claimed he did not know where that notebook was located. A 1993 pocket calendar containing photocopies of sexually explicit photographs of Trahan was discovered on the top of Defendant's desk during the search of his private office.
*139 The missing jot book containing the entries from December 14, 1993, to August 4, 1994, was discovered by Detective Craft in a large box labeled "1982 records" in a messy and disorganized storage room behind Defendant's private office. This box was beneath another large box of records from the 1980's. Detective Craft testified that, other than the jot book, he did not find anything else from the 1990's in the storage room. The jot book began with entries for December 14, 1993, and ended with entries for blood draws on August 4, 1994. The remaining portion of the notebook after the August 4, 1994 entries was not used and contained a large number of blank pages.
Detective Craft focused his investigation upon an entry for August 4, 1994, as it was different from all of the other entries in the three jot books. Detective Craft testified that the entries consisted of the date of the blood draw, the patient's name, the tests to be performed, and a numbered accession sticker. Each accession sticker in the jot book corresponded to a matching accession sticker attached to a vial containing blood. The numbers on the accession stickers were used to cross-reference the test results with the patient. On August 4, 1994, one entry had the date and patient's name, but did not include a test to be performed or an accession sticker. Instead, the entry said "Lavender stopper for Dr. S." According to Detective Craft, further study of the jot book revealed another near identical entry for a blood draw from patient, L.L.,[5] on August 2, 1994. That entry contained the notation "(Purple Top for Dr.)"
L.L., the patient from whom blood was drawn on August 2, 1994, was a Hepatitis C patient. The patient from whom blood was drawn, but no tests ordered or accession sticker used on August 4, 1994, was D.M., the AIDS patient who was also being treated by Dr. Wong. Both L.L. and D.M. gave Detective Craft consent to obtain their medical files from Defendant. However, after Detective Craft obtained a search warrant for D.M.'s medical file, it could not be located at Defendant's office. In August 1996, almost one year after the initial search of Defendant's office for D.M.'s medical file, Detective Craft was notified by one of the attorneys representing Defendant that D.M.'s medical file was at his office. Detective Craft retrieved the file, but it contained no reference to the August 4, 1994 blood draw. D.M.'s medical chart was inconsistent not only with the jot book entry of August 4, 1994, but also with Defendant's billing records. The billing records for D.M. and L.L. were introduced during trial. It was the procedure in Defendant's office that his staff issue a "super bill" each time a patient came into the office, which was sent to the company that billed the patient's insurance companies.[6] The super bill for D.M., prepared on August 4, 1994, had a check mark in the block entitled "Drawing Fee," but the check mark was crossed out without explanation.
D.M. testified that he went to Defendant's office on August 4, 1994, for blood tests and a Vitamin B-12 shot in anticipation of a colonoscopy. D.M. was diagnosed HIV positive in 1990, and, in 1992, his condition deteriorated to the point that he developed AIDS. D.M. was also treated by *140 a number of physicians for a form of cancer known as non-Hodgkins lymphoma, but, as of August 4, 1994, he was no longer receiving chemotherapy. He was treated intermittently by Defendant for gastrointestinal problems, and, because he had a family history of colon cancer, he requested a colonoscopy before school started in August 1994.
There was considerable controversy surrounding D.M.'s recollection of the August 4, 1994 blood draw because he did not remember seeing how the "D" in his name was misshaped until several weeks before the trial. In prior statements and a deposition taken as evidence in civil litigation, D.M. never mentioned this fact. However, in his first statement to authorities, D.M. said that, although he did not specifically recall the particular blood draws at Defendant's office in July and August 1994, he was certain that he would see Defendant, receive a B-12 shot, and have blood drawn for further testing every time he went to Defendant's office. It is noted that D.M. filed a civil lawsuit against Defendant for monetary damages because his employment as a teacher was threatened since the criminal proceedings exposed his AIDS to the public.
L.L. testified that she was a patient of Defendant since May 1993. She contracted Hepatitis C from the abuse of intravenous drugs, sex, blood transfusions, and excessive alcohol consumption. According to L.L., each time she went for her regular four-month visit, she received a prescription from Defendant to have blood drawn at the hospital. Her insurance did not cover blood drawn at Defendant's office, but, instead, required her to have it drawn at Our Lady of Lourdes Hospital. However, L.L. recalled that the only time Defendant drew her blood at his office was on August 2, 1994. She testified that Defendant claimed he was conducting his own private study of Hepatitis C and asked her for a blood sample. She acquiesced only after Defendant agreed that she would not be charged. L.L. testified that Defendant's office nurse, Geraldine Sonnier, then drew a sample of her blood. She further testified that she also had blood drawn at Our Lady of Lourdes Hospital on that same day for tests ordered by Defendant. L.L. claimed that, when she returned to Defendant's office in December 1994, she asked about the tests and his study, but Defendant replied that he "did not find anything." Like D.M., L.L. also filed a civil lawsuit against Defendant because her name and her condition became public as a result of this criminal matter.
Defendant's office staff denied drawing blood from either L.L. or D.M. on the dates at issue. Although Sonnier identified her handwriting on the jot book entries for L.L. and D.M., she testified that she did not recall drawing blood from either patient. She noted that D.M.'s medical chart did not show that he had blood drawn on August 4, 1994. Sonnier was adamant that, if the medical charts or files of the patients did not show that blood was drawn, then she did not draw blood.
Concerning the disappearance of the jot book containing the August 2 and 4, 1994 entries, Sonnier testified that she simply used a sheet of loose paper from a note-book when she could not find the jot book. According to her testimony, the first day she had to use a loose sheet of paper was August 5, 1994. She testified she told the other employees the jot book was missing, but did not inquire as to its whereabouts.
Toni Lalonde, Defendant's receptionist, testified for the purpose of identifying the appointment book used in his office. Lalonde knew L.L. personally and testified that she did not have blood drawn at Defendant's office on August 2, 1994. Lalonde also stated that D.M. did not have an appointment listed in the appointment book for August 4, 1994. She acknowledged under cross-examination that there were numerous erasures of entries with other information written over them on both August 2 and 4, 1994. We note that the appointment book has erasures on other *141 dates both before and after August 1994.
The State also presented evidence about the nature of the relationship between Defendant and Trahan. Trahan testified that Defendant was possessive of her and became enraged whenever she wanted to end the relationship. The evidence showed that Defendant threatened Trahan with publication of the sexually explicit photographs, and he threatened to tell officials at the University of Southwestern Louisiana (USL) that she had cheated by allowing him to write her papers. There was also evidence that Defendant threatened at least one of her boyfriends.
Barry Bleichner testified that he met Trahan at a 1993 New Year's Eve party, and the two began dating in early 1994. At the end of May 1994, Bleichner invited Trahan to a crawfish boil, but testified that she cancelled because of Defendant's anger upon learning of their dating. According to Bleichner, Defendant telephoned him a week later; told him that he knew about their dating; and gave intimate details of Bleichner's relations with Trahan, some of which were incorrect. Bleichner explained that Defendant alternated between anger and calm during their conversation. At the end of the conversation, Defendant made a veiled threat to Bleichner by saying he knew where he lived. After the conversation, Bleichner claimed he called a friend, who was a policeman, to see if he should secure a peace bond or other court order against Defendant. Bleichner testified that Defendant called him back minutes later and apologized. Bleichner further testified that, a week later Defendant drove up while he was working in his front yard, got out of his car, and asked him to return some photographs Trahan had given him of herself. According to Bleichner, when he told Defendant he would be glad to return them to Trahan, but not to him, Defendant asked him if he wanted to fight. Bleichner recounted that he did not take Defendant seriously, even after Defendant asked him to take off his sunglasses. Bleichner claimed Defendant then stated, "if you see Janice again, I am going to kill you."
The evidence also reflected that Defendant took sexually explicit photographs of Trahan, and of himself with Trahan, early in their relationship. Defendant used the threat of publicizing the photographs when Trahan wanted to end their relationship. On one occasion, when Trahan tried to end the relationship, Defendant threatened to post copies of the photographs throughout the hospital where she worked. These photographs were seized by police during the July 13, 1995 search of Defendant's office.
To prove Defendant threatened to accuse Trahan of cheating, the State called several members of the faculty and staff of USL as witnesses. Dr. Gail Poirrier, acting Dean of the School of Nursing and the department head in the Spring of 1990, testified that she received frequent, anonymous telephone calls from a man claiming to have written some of Trahan's papers. The caller initially would not identify himself, but, after calling for three weeks, finally identified himself as Dr. Schmidt. According to Dr. Poirrier, this was about one week before graduation and he told her that he wanted to come clean about what he did for Trahan. Dr. Poirrier found it unusual that Defendant suggested that the university punish Trahan by prohibiting her graduation. She further testified that, during the course of these telephone calls, she questioned some of Trahan's instructors as to whether they thought Trahan cheated, and they felt she had not. Dr. Poirrier claimed that she informed Defendant that cheating allegations were handled by the Dean of Student Personnel and that she turned the matter over to that office.
Dr. James Clark, the Dean of Student Personnel in the Spring of 1990, investigated charges of student cheating. He testified that he called Defendant's office and asked Defendant to contact him, but Defendant never called back. Dr. Clark then *142 turned the matter over to his assistant, Dr. Cheryl Evans, who wrote Defendant and asked him to contact her by July 13, 1990. However, since Dr. Evans never received a response from Defendant, nothing came of the allegations and Trahan graduated with a nursing degree.
Defendant contended that he did not and could not have gone to Trahan's home on August 4, 1994. His wife, Barbara Schmidt, testified that she was with Defendant on the night of August 4, 1994, from 8:00 p.m. until the next morning. The only time that she could not account for Defendant's whereabouts was during the twenty minutes that she was bathing. Defendant argued that it would have been physically impossible to drive to Trahan's home, administer an injection, and return to his home within twenty minutes. Corporal Rodney Ward, the training coordinator and traffic accident reconstructionist of the Lafayette Police Department, testified that Defendant lived five miles from Trahan and he was able to drive from Defendant's house to Trahan's house during the evening hours (10:05 p.m.) in eight minutes and thirty-six seconds and from Trahan's house to Defendant's house in eight minutes and fourteen seconds.
Defendant further contended that he would have had to act quickly to enter Trahan's home, administer the injection, and leave, even if the distance could have been covered in less than twenty minutes. He presented evidence from his wife, his office personnel, and his treating physician that he strained his back at the end of July 1994 and was rendered physically incapable of quick movement.
Defendant established that he strained his back while lifting luggage at a seminar in late July 1994. Yet, the evidence reflects that he went to work at his office and performed hospital procedures as usual and did not seek medical attention until early September 1994. In August 1994, Defendant called Dr. Thomas Bertuccini, a neurosurgeon, about his back strain. Dr. Bertuccini noted that Defendant tolerated his condition reasonably well. When Defendant went to see Dr. Bertuccini on September 6, 1994, he told Dr. Bertuccini that he hurt his back in late July while lifting luggage and again in early August while lifting heavy boxes at his office. Mrs. Schmidt also testified that Defendant told her he re-aggravated his back injury in the middle of August while lifting heavy boxes at his office. We note that the lifting of heavy boxes by Defendant in his office in August 1994 is consistent with the State's theory that he hid the jot book containing the August 4, 1994 notations at the bottom of a stack of file storage boxes in his office.
The remainder of the witnesses were experts who testified about the phylogenetic analysis conducted on Trahan's and D.M.'s HIV to determine if their viruses were related. According to the State, the purpose for the introduction of this evidence was to show that D.M. could not be excluded as the possible source of the HIV injected into Trahan, rather than to prove that D.M. was the actual source of the HIV. This evidence and the testimony of the experts will be discussed more fully in assignments of error numbers one and five.

ASSIGNMENT OF ERROR NUMBER ONE
In this assignment of error, Defendant attacks the evidence presented against him, particularly the State's theory of the case. According to Defendant, the State's proof was limited by the indictment and the bill of particulars. The State used a short-form indictment against Defendant and later, in response to his discovery request, furnished him a bill of particulars giving details about how he attempted to kill Trahan.
Defendant contends that the State had to prove that he acquired HIV-tainted blood, that he injected Trahan with the blood, and that this injection was the source of her HIV. Defendant focuses on three areas of weakness in the State's *143 case: (1) whether D.M. was the source of the HIV injected into Trahan; (2) whether he gave her the "shot in the dark" on August 4, 1994; and (3) whether the State excluded other possible sources of Trahan's HIV. However, attempted second degree murder is proven when a defendant, having the specific intent to kill, does an act for the purpose of or tending to accomplish his object to kill another person. See La.R.S. 14:27 and 14:30.1. Therefore, the State did not have to prove that Trahan became HIV positive as a result of the injection administered by Defendant. The State only had to prove that Defendant administered the suspect injection to Trahan and that he intended her death as a result of the injection.
The State presented direct evidence (Trahan's testimony) that Defendant gave Trahan an injection on August 4, 1994. The victim's testimony may be sufficient to prove the elements of the offense, even when the State does not introduce medical, scientific, or physical evidence to prove that the defendant committed the offense. State v. Turner, 591 So.2d 391 (La.App. 2 Cir.1991), writ denied, 597 So.2d 1027 (La.1992). In this case, the jury apparently believed Trahan's testimony, and we do not find it unreasonable for the jury to have done so. State v. Hobley, 98-2460 (La.12/15/99); 752 So.2d 771.
All other evidence against Defendant was circumstantial in nature. When a conviction is based on direct and circumstantial evidence, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a reasonable juror to conclude, beyond a reasonable doubt, that the defendant was guilty of every essential element of the crime. State v. Jacobs, 504 So.2d 817 (La.1987). The rule as to circumstantial evidence is that, assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La.R.S. 15:438.
[W]hile an evaluation of other reasonable hypotheses of innocence provides a helpful methodology for determining the existence of reasonable doubt, the reviewing court does not simply determine whether there is another hypothesis which could explain the events in an exculpatory fashion. Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether any alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof beyond a reasonable doubt.
State v. Joseph, 98-48, pp. 3-4 (La.App. 3 Cir. 7/1/98); 716 So.2d 927, 929, citing State v. Captville, 448 So.2d 676 (La.1984).
As we noted, a conviction of attempted second degree murder, in violation of La.R.S. 14:27 and 14:30.1(A), requires a finding that the defendant had the specific intent to kill and that he committed an act for the purpose of and tending directly toward accomplishment of his object.[7] Specific intent is defined by statute as the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). The specific intent or state of mind of a defendant may be proven directly as a fact or may be proven circumstantially by inferences drawn from the circumstances of the transaction and the actions of the defendant. State v. Guillory, 95-383 (La.App. 3 Cir. 1/31/96); 670 So.2d 301, citing State v. Turner, 626 So.2d 890 (La.App. 3 Cir.1993), writ denied, 93-3182 (La.4/4/94); 635 So.2d 1122.
Although specific criminal intent is subjective in character, the State may establish it by direct evidence. Generally, direct evidence of a defendant's state of mind or his specific intent will consist of *144 the statements or admissions of the defendant. State v. Williams, 95-879 (La.App. 3 Cir. 1/31/96); 670 So.2d 414. However, in the absence of an admission of such intent by a defendant, the State must prove the defendant's specific intent by circumstantial evidence. In this latter situation, the defendant's specific intent or state of mind will be something that cannot be seen, photographed, or observed visually by the trier of fact, but must be inferred from all circumstances established at trial. State v. Hillman, 353 So.2d 1356 (La.App. 3 Cir.1977), citing State v. Jones, 315 So.2d 650 (La.1975).
Circumstantial evidence consists of the proof of collateral facts and circumstances from which the existence of the main fact, specific intent, may be inferred according to reason and common experience. Guillory, 670 So.2d 301, citing State v. Donahue, 572 So.2d 255 (La.App. 1 Cir. 1990). The circumstantial evidence rule does not require the State to exclude every possible theory of innocence, but only the reasonable hypotheses of innocence. State v. Lilly, 468 So.2d 1154 (La.1985). In circumstantial evidence cases, the reviewing court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, we evaluate the evidence in the light most favorable to the prosecution and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Davis, 92-1623 (La.5/23/94); 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).
This is not the first case in Louisiana in which a defendant has been convicted of attempted second degree murder for exposing a victim to the HIV virus. In State v. Caine, 94-0119 (La.App. 1 Cir. 3/3/95); 652 So.2d 611, writ denied, 95-0860 (La.10/27/95); 661 So.2d 1358, the court upheld the defendant's conviction for attempted second degree murder of a convenience store clerk. In Caine, the clerk saw the defendant trying to steal merchandise and she attempted to force the defendant to leave the store. The defendant stabbed her with a needle, that was possibly contaminated with the HIV virus, and said, "I'll give you AIDS." The defendant alleged that the State failed to prove specific intent to kill. The court found that the action of the HIV-positive defendant, in attacking the victim with a syringe, proved that he had the specific intent to kill her and, thus, upheld his attempted second degree murder conviction.
In this case, Defendant claims that the State's case rests on two points: (1) that D.M. was the source of the HIV blood injected into Trahan; and (2) that the drawing of the HIV blood from D.M. and injection of this HIV into Trahan must have occurred on August 4, 1994. Defendant relies primarily upon his claim that D.M.'s HIV is AZT-sensitive,[8] whereas Trahan's HIV is AZT-resistant, to establish a reasonable doubt that D.M. was the source of Trahan's HIV infection. However, Dr. Wong explained that classifying D.M.'s HIV as AZT-sensitive was misleading. According to Dr. Wong, the dramatic improvement in D.M.'s condition occurred whenever D.M. took AZT in combination with other drugs, but there was relatively little improvement when D.M. took AZT by itself. Also, Dr. Wong noted that D.M.'s condition had deteriorated into AIDS, while Trahan suffered from Hepatitis C, in addition to HIV, as possible reasons why AZT treated their HIV infections differently.
We considered whether there was a relationship between the HIV of D.M. and that of Trahan. The State's evidence established that D.M. could not be excluded as a possible source of the HIV injected into Trahan. Dr. Michael Metzker, *145 tendered by the State as an expert in the general field of molecular genetics and in the area of phylogenetic analysis of HIV deoxyribonucleic acid (DNA) sequences, testified that his study of the relationship between the DNA of the HIV viruses of D.M. and Trahan could not establish direct transmission because, with the transmission of HIV from person to person, a virus alters or mutates its DNA. Dr. Metzker used phylogenetic analysis of the sequencing of the DNA of various HIV to attempt to reconstruct a history of transmission of the HIV. He explained that phylogenetic analysis is a series of methodologies used to establish the degree of relationship, if any, existing between viruses. After explaining the steps taken in his phylogenetic analysis of the HIV from D.M. and Trahan, Dr. Metzker found a "significant relation" between those two HIV when compared against a control group of HIV samples from Houston. The same relationship was found when the HIV of D.M. and Trahan were compared with a control group of HIV samples from the Lafayette area.
On the other hand, Dr. Bette Korber, Defendant's expert witness on molecular epidemiology and phylogenetic analysis of HIV DNA, testified that there is no way to match viral DNA, such as HIV DNA, that has been transmitted from one person to another. According to Dr. Korber, the best that can be done is phylogenetic analysis, which statistically determines relatedness. Dr. Korber said that the HIV DNA of D.M. and Trahan were not totally unrelated and stated that, if the HIV DNA of D.M. and Trahan were unrelated, then they would have been located on different parts of the phylogenetic tree graph. However, the HIV DNA of D.M. and Trahan were on the same part of the phylogenetic tree.
In order to dispel pretrial controversy over the possibility of contamination or cross-contamination of HIV DNA samples, the State had Dr. David Mendell of the University of Michigan, an expert qualified in the field of evolutionary biology with a focus on molecular phylogenetics, perform a separate sequencing of the HIV DNA of D.M. and Trahan. Dr. Mendell's sequences were studied by Dr. David Hillis of the University of Texas, an expert in the field of phylogenetic analysis of HIV DNA sequences, who found the two test results were consistent. Dr. Hillis stated that "the viruses present in [D.M.] and Janice Trahan were the most closely related sequences in the analysis, and as closely related to sequences isolated that two individuals could be." He further testified, that in his opinion, there was "no evidence whatsoever for any contamination."
Defendant's experts also attacked the statistical analysis of relatedness on another level. They contended that the control group of HIV samples from Lafayette should have been individuals similar to Trahan and D.M., that is, heterosexual, non-intravenous drug abusing females and homosexual males infected in the 1994 time frame.
As we have stated herein, the State did not argue that its tests proved D.M. was the source of the HIV given to Trahan; instead, the State relied upon the tests and the testimony of its experts to serve as additional circumstantial evidence of Defendant's guilt. The jury heard the testimony of the State's and Defendant's expert witnesses, who were all eminently qualified in the field of DNA analysis of HIV, and decided the case accordingly. We will not invade the jury's discretionary fact-finding function on this issue. We also note that the experts' conclusions concerned only one issue in this complicated case, and none of the experts' testimony addressed the other circumstantial and direct evidence of Defendant's guilt.
Defendant also claims that the State did not prove that Trahan's Hepatitis C infection resulted from an injection of the Hepatitis C-tainted blood of L.L. The State presented the evidence concerning L.L. to establish a scheme by Defendant to improperly obtain tainted blood and cover-up *146 his actions. That same evidence concerning L.L. was also proof of Defendant's intent in early August 1994. Finally, the evidence showed that L.L. was still receiving Interferon treatment and that she was not told she was in remission as of August 2, 1994. That evidence also contradicts Defendant's expert witness' testimony that L.L.'s Hepatitis C virus could not have infected Trahan in early August 1994.
In contending that the State failed to exclude other sources of HIV infection for Trahan, Defendant emphasizes the fact that, although Trahan had more than three sexual partners, she only revealed that many to Sellers and Dr. Daigle. As we have noted, Sellers' responsibility, as Infection Control Coordinator, was to counsel employees who were exposed to infectious diseases and make recommendations as to whether they should remain on the job, be transferred to another job, or stop working at the hospital. Her duties did not include determining how many sexual partners an employee had or the identities of these sexual partners. She testified that, when Trahan told her about the three men, she was "thinking out loud" as if "in a stream of consciousness." Sellers also testified that she did not ask Trahan about any of her sexual partners. Further, in Dr. Daigle's testimony, we can find no instance in which he asked Trahan to name all of her sexual partners. Finally, Trahan forthrightly revealed intimate details about her sexual history. Other than mere accusation, Defendant did not establish that Trahan had sexual partners other than the seven men mentioned at trial, and none of them had the HIV or Hepatitis C virus.
Defendant's actions after August 4, 1994, are as incriminating as his actions on August 2 and 4, 1994. There was testimony supporting a finding that Defendant tried to hide the jot book containing the entries for L.L.'s and D.M.'s blood draws by concealing the notebook at the bottom of a storage box containing 1982 files, and then placing other heavy storage boxes on top of this box. Given this evidence, the jury could have reasonably determined that Defendant injured his back in an attempt to conceal the jot book. There was also testimony that Defendant told his wife and treating physician that he injured himself lifting heavy boxes at his office in August 1994. Additionally, the medical file or chart of D.M. disappeared from the Defendant's office, but reappeared at the office of Defendant's attorney over one year after the initial search for the record. The jury apparently believed the State's theory that the medical chart of D.M. had been "doctored" because it contained no reference to the August 4, 1999 blood draw; yet, the super bill issued on August 4, 1994, and the jot book contained references to blood being drawn from D.M. on this date.
Louisiana courts have admitted evidence of the acts of an accused that obstruct justice or avoid punishment for the current crime with which he is charged because this evidence may constitute admissions of guilt by conduct. State v. Broussard, 94-40 (La.App. 3 Cir. 11/23/94); 649 So.2d 726. Evidence of an attempt to conceal evidence indicates a consciousness of guilt and, therefore, is one of the circumstances from which a jury may infer guilt. For example, in State v. Harvey, 26,613 (La.App. 2 Cir. 1/25/95); 649 So.2d 783, writ denied, 95-0430, 95-0625 (La.6/30/95); 657 So.2d 1026, 1028, the trial court admitted evidence that, after a police officer accused of murdering his wife was released on bail, a cassette recorder that recorded all telephone conversations disappeared. The defendant in Harvey did not know that a relative of the victim had already found the tape recorder and removed the cassette tape containing incriminating telephone conversations. Defendant's consciousness of guilt was evidenced by his concealment or destruction of evidence. In the instant case, the jury would not have been unreasonable in finding that Defendant's actions after August 4, 1994, demonstrated his consciousness of *147 guilt because he attempted to conceal and destroy evidence.
The State also presented evidence that Defendant used his professional status to mislead the physicians treating Trahan. He informed Dr. Mesa that he performed an HIV test on Trahan and the test was negative. When told that his former mistress was HIV positive, he adamantly stated that he knew he was HIV negative and refused to be tested. After August 4, 1994, he no longer had any sexual contact with Trahan. Accordingly, the jury could have reasonably concluded from this evidence that Defendant knew that he had not been exposed to HIV from his sexual relations with Trahan, because he knew precisely when and how she was infected with the disease.
The jury also heard conflicting evidence concerning the blood draw from D.M. Defendant relies on D.M.'s chart and the statements of his office personnel to establish that D.M. did not have blood drawn at his office on August 4, 1994. However, the State presented evidence about the suspicious disappearance and reappearance of D.M.'s medical chart, as well as the inconsistencies between the chart, the jot book, the super bill, and the testimony of witnesses regarding the blood draw. The jury apparently made a credibility determination in favor of D.M. and against Defendant's employees. Both the direct and circumstantial evidence introduced at trial was sufficient to allow the jury to make a reasonable determination that the tainted blood was drawn from D.M. pursuant to Defendant's orders on August 4, 1994.
Trahan's testimony established that the injection was given on August 4, 1994, and the State introduced corroborating evidence in the form of Defendant's cell phone bill showing he called Trahan at 10:26 p.m. that evening. Defendant offered contradicting evidence, primarily the testimony of his wife, concerning the period of time that she did not see Defendant while she was bathing on August 4, 1994. There was also conflicting evidence regarding Defendant's back problem, and the jury was free to believe that he did not establish he was physically incapable of driving to Trahan's home, going inside to give her the injection, and then leaving quickly. This evidence was sufficient for the jury to reasonably conclude that the injection was administered by Defendant to Trahan.
Finally, the State introduced evidence that HIV is a fatal disease, that HIV-tainted blood was drawn from D.M. on Defendant's order, and that Defendant administered the injection to Trahan on the night in question. Furthermore, Trahan contracted HIV around this same time frame with no other reasonable explanation of infection, which further supports the conclusion that the injection was not a B-12 shot, but contained HIV-tainted blood. Thus, we find that, when all of the evidence presented is viewed in a light most favorable to the prosecution, a rational trier of fact could have concluded that the State proved beyond a reasonable doubt that Defendant was guilty of the attempted second degree murder of Trahan.

ASSIGNMENT OF ERROR NUMBER TWO
By this assignment of error, Defendant claims the trial court erred when it denied his challenge for cause of prospective juror, Thomas Coleman. Since Defendant exercised all of his peremptory challenges, he argues this issue should be reviewed by this court. However, the State argues that Defendant did not object after the trial court denied his challenge for cause. Defendant contends that he is not bound to use the word "objection," but simply must inform the court of the ruling with which he disagrees. We agree. In this case, Defendant did inform the court of his challenge for cause, and we find that is sufficient to preserve the issue for appellate review.
*148 A criminal defendant has the fundamental right to have a jury determine whether he may be guilty or innocent; whether the state proved all elements of the crime beyond a reasonable doubt. La. Const. art. I, § 17; State v. Lacoste, 256 La. 697, 237 So.2d 871 (1970). Nevertheless, this fundamental right would become meaningless if not guided by the principle that the jury should be impartial in order to ensure that the criminal defendant receives a fair trial. This principle does not mean that a criminal defendant has the right to be tried by a particular type of jury or juror, but it simply means that it is essential that the jury be impartial and competent. State v. McLean, 211 La. 413, 30 So.2d 187 (1947); State v. Lewis, 98-904 (La.App. 3 Cir. 12/9/98); 724 So.2d 830, writ denied, 99-0438 (La.11/12/99); 749 So.2d 649. To ensure that the jury is competent and impartial, La. Const. art. I, § 17 provides safeguards, such as the defendant's "right to full voir dire examination of prospective jurors and to challenge jurors peremptorily."
The purpose of voir dire is to test the competency and impartiality of prospective jurors to determine whether they are fit to serve on the jury. Voir dire is designed to uncover information about the prospective jurors, which may be used as a basis for challenges for cause or exercise of peremptory challenges. State v. Berry, 95-1610 (La.App. 1 Cir. 11/8/96); 684 So.2d 439, writ denied, 97-0278 (La.10/10/97); 703 So.2d 603. When a defendant exposes the partiality of a juror, the juror may not be automatically excluded for cause. The state or the trial court may rehabilitate the juror by asking questions and obtaining answers demonstrating the juror's ability to decide the case impartially pursuant to law and evidence. Ultimately, the trial court has the power to determine whether or not a juror may be excused for cause. State v. Turner, 96-845 (La.App. 3 Cir. 3/5/97); 692 So.2d 612, writ denied, 97-2761 (La.2/20/98); 709 So.2d 773.
To succeed on appeal with the claim that the trial court erroneously denied the challenge of a prospective juror for cause, a defendant must exhaust his peremptory challenges and show that the trial court's denial of his challenge for cause was an abuse of discretion. State v. Cross, 93-1189 (La.6/30/95); 658 So.2d 683; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278; appeal after remand, 97-0177 (La.3/4/98); 712 So.2d 8, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998); Turner, 692 So.2d 612. Once these factors have been established, prejudice is presumed and need not be shown by the defendant. Id.; Cross, 658 So.2d 683. In Cross, the Louisiana Supreme Court stated that a trial court's erroneous ruling on a challenge for cause, depriving the defendant of one of his peremptory challenges, "constitutes a substantial violation of [the defendant's] constitutional and statutory rights, requiring reversal of the conviction and sentence." In Turner, 692 So.2d at 616, we wrote:
The trial judge is vested with broad discretion in ruling on challenges for cause, and his ruling will be reversed only when a review of the entire voir dire reveals the judge abused his discretion. State v. Robertson, 630 So.2d 1278. "A trial judge's refusal to excuse a prospective juror for cause is not an abuse of discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, where subsequently, on further inquiry or instruction, [the juror] has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence." Cross, 658 So.2d at 687. See also State v. Welcome, 458 So.2d 1235 (La.1983), cert. denied, 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 152; State v. Passman, 345 So.2d 874, 880 (La.1977). In this case, defendant exhausted all of his peremptory challenges. Thus, the only question left for our determination on appeal is whether the trial judge erred in denying defendant's *149 challenge seeking to excuse [the prospective juror] from the jury venire for cause.
Therefore, we must consider whether the trial court committed error in denying Defendant's challenge for cause of juror Coleman. The voir dire examination of Coleman revealed that he was employed as a tape operator by the Channel Three television station in Lafayette, where he overheard reporters discussing the case. Although he had not expressed an opinion to others and had simply overheard the opinions of others, he testified that he felt what happened was wrong. Initially, he said that, based upon what he heard, he thought Defendant injected Trahan with HIV. However, Coleman stated that his opinion could change after learning all of the facts. Coleman said that he could put aside what he heard, be impartial, base his judgment on the facts presented in the courtroom, and follow the law as given by the judge. During questioning by Defendant, Coleman stated, "If you're innocent, you should be able to prove that you're innocent, during the trial." The trial court then explained the presumption of innocence, that is, that Defendant did not have to prove his innocence or anything else and that the State had to prove guilt beyond a reasonable doubt before there could be a conviction. Coleman said he understood the presumption of innocence, and he explained that his understanding was that the failure of the State to prove Defendant was guilty was the same as the Defendant proving he was not guilty, and that he could not vote guilty in either situation.
We find that the trial court did not err in denying the challenge for cause. Coleman candidly admitted that he only knew bits and pieces of the case and not all of the facts. He said he only overheard some of the reporters state their opinions as to Defendant's guilt, but he had not formed a firm opinion since he did not know all of the facts. As a lay person, Coleman could not be expected to recite the law concerning the presumption of innocence and the burden of proof in criminal cases. Once the trial court explained the law to him, Coleman explained his understanding of the law and that he could follow the law. For those reasons, we hold that this case is distinguishable from Turner, 692 So.2d 612, where the prospective juror was never rehabilitated, but continued throughout voir dire to state that the defendant had to prove his innocence. Therefore, this assignment of error is without merit.

ASSIGNMENTS OF ERROR NUMBERS THREE AND FOUR
Defendant has argued these assignments of error together since they concern other crimes evidence, but has divided his argument into two parts. First, he argues that the State should not have been permitted to present evidence of the blood draw from L.L. Second, he claims that certain other evidence presented to establish his motive was inadmissible.
Generally, evidence of other acts of misconduct is inadmissible; however, there are statutory and jurisprudential exceptions to this exclusionary rule, particularly when the evidence of other acts tends to prove a material issue and has independent relevance other than showing that the defendant is a person of bad character. State v. Willis, 98-434 (La.App. 3 Cir. 10/28/98); 721 So.2d 103, writ denied, 99-3309 (La.5/5/00); 761 So.2d 541; State v. Mitchell, 94-521 (La.App. 3 Cir. 11/2/94); 649 So.2d 569.
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. La.Code Evid. art. 404(B)(1). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes which are listed in Article 404(B)(1).[9] In State v. *150 Johnson, 94-1379 (La.11/27/95); 664 So.2d 94, writ denied, 94-1379 (La.4/8/96); 671 So.2d 332, the supreme court provided an overview of the use of evidence of other crimes, wrongs, or acts. The general rule is that such evidence is inadmissible unless statutory and jurisprudential prerequisites are met. See also State v. McArthur, 97-2918 (La.10/20/98); 719 So.2d 1037. This general rule ensures that a defendant, who has committed other crimes, wrongs, or acts, will not be convicted of a present offense simply because he is perceived as a "bad person," irrespective of the evidence of his guilt or innocence. "A conviction should be based on guilt and not on character." Johnson, 664 So.2d at 99; State v. Jackson, 98-277, p. 7 (La.App. 3 Cir. 2/3/99); 734 So.2d 658, 663.

The Blood Drawn from L.L.
Defendant claims that evidence that he improperly ordered a blood draw from L.L. put him on trial not only for the charged offense of attempting to murder Trahan by injecting her with HIV, but also for attempting to murder her by injecting her with the Hepatitis C virus. He contends that the State's theory that he injected Trahan with D.M.'s HIV was flawed because she suffered from Hepatitis C, as well as HIV, but D.M. did not suffer from Hepatitis C. According to Defendant, the State had to introduce an explanation of how Trahan contracted Hepatitis C. For that reason, Defendant argues the State turned to the August 2, 1994 blood draw from L.L. Defendant then claims that the State could not prove Trahan's Hepatitis C came from an injection of D.M.'s blood. Thus, he concludes the State introduced evidence of the blood draw from L.L. on August 2, 1994, under the ruse of "other crimes evidence."
We have already addressed the admissibility of this particular evidence in the pretrial writ opinion in State v. Schmidt, 97-249 (La.App. 3 Cir. 7/29/97); 699 So.2d 448, writ denied, 97-2220 (La.12/19/97); 706 So.2d 451. In our opinion, we stated that the trial court did not err in its preliminary ruling that this evidence was admissible, but the ultimate question of admissibility would be addressed at the trial on the merits.
The State argues that similarities in the manner in which blood was drawn from L.L. and D.M. established Defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." The State further contends that the evidence also provided the context in which the crime was committed and that it related to conduct that constituted an integral part of the act or transaction that was the subject of the trial.
Other crimes evidence is admissible when it is intertwined with the charged offense to such an extent that the State could not accurately present its case without reference to the evidence. State v. Brewington, 601 So.2d 656 (La.1992). In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but, rather, to complete the story of the crime on trial by proving the immediate context of happenings near in time and place.
In the missing jot book, only the August 2, 1994 blood draw from L.L. and the August 4, 1994 blood draw from D.M. had the notations purple or lavender stopper or top for Defendant. The evidence of the blood draw from L.L. did not establish Defendant was a "bad person," but it was *151 relevant to the material issue of Defendant's opportunity to obtain tainted blood, his preparation and planning for the injection of Trahan on August 4, 1994, and his guilty knowledge or absence of mistake or accident. Additionally, the evidence also presented an explanation of how Trahan became infected, not only with the HIV virus, but also the Hepatitis C virus. This countered Defendant's argument that, since Trahan was infected with both diseases, she could not have acquired the diseases through the injection she allegedly received.
Therefore, we find that the trial court did not abuse its discretion in admitting the evidence of L.L.'s blood draw of August 2, 1994.

The Remaining Evidence of Other Crimes, Wrongs, or Acts
The remaining acts, crimes, or wrongs of Defendant were introduced by the State to prove his motive and, ultimately, provide circumstantial evidence of his specific intent to kill Trahan. This evidence consisted of the following: a July 1990 rape of Trahan by Defendant; a late 1980's rape of Trahan by Defendant; Defendant calling USL to report that Trahan had cheated and should not be allowed to graduate; Defendant's threats against Trahan if she left him; Defendant's threats against Bleichner; and Defendant's threats to distribute sexually explicit photographs of Trahan if she ended their relationship.
Defendant argues that intent was never an issue at trial. However, specific intent is an element of the crime of attempted second degree murder and, thus, intent was a material issue to be proven at trial. The State introduced the evidence to establish Defendant's motive and his pattern of conduct whenever Trahan attempted to end their relationship.
In McArthur, 719 So.2d at 1041-42, the Louisiana Supreme Court explained when other crimes evidence is admissible to establish the "motive" of a defendant:
"`Motive' evidence reveals the state of mind or emotion that influenced the defendant to desire the result of the charged crime." D. Bryden and R. Park, "Other Crimes" Evidence in Sex Offense Cases, 1994 Minn. L.Rev. 529, 541.... "In order to have independent relevance, the motive established by the other crimes must be more than a general one, such as gaining wealth, which could be the underlying basis for almost any crime; it must be a motive factually peculiar to the victim and the charged crime." State v. Sutfield, 354 So.2d 1334, 1337 (La.1978) (evidence of heroin addiction inadmissible to show the motive for armed robbery); see also State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190 (evidence that defendant told four people that he had killed the decedent because she accused him of raping her after they had sexual intercourse was admissible to show his motive to commit murder). If ... the other crimes evidence does not tend to show a motive to commit this particular crime against this particular victim, it merely shows a character trait and is inadmissible character evidence.
In the case at hand, Defendant's motive was factually peculiar to this victim and the charged offense, that is, committing an act with the specific intent to kill her. The above listed acts, wrongs, and other crimes were admissible to establish Defendant's motive to commit the crime of attempted murder of Trahan. Those acts, in fact, established his peculiar obsession with this particular woman and the lengths to which he would go to satisfy that obsession.
Therefore, we find that this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER FIVE

and

DEFENDANT'S PRO SE ASSIGNMENT OF ERROR
These assignments of error raise the issue of the admissibility of the *152 scientific analysis of D.M.'s and Trahan's HIV DNA. The issue of admissibility came before this court in a pretrial writ application and, after briefing and oral arguments from counsel, this court issued an opinion in Schmidt, 699 So.2d 448. In the writ opinion, we determined that the methodology used by Dr. Metzker in his investigation satisfied the standards of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); State v. Foret, 628 So.2d 1116 (La. 1993), and State v. Quatrevingt, 93-1644 (La.2/28/96); 670 So.2d 197, cert. denied, 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996) and, thus, his study was admissible. It is well-settled that a defendant may, once again, seek review of a pretrial ruling by the trial court even after the denial of a pretrial supervisory writ application seeking review of the same issue.
The prior denial of supervisory writs does not bar reconsideration of an issue on appeal, nor does it prevent the appellate panel from reaching a different conclusion. State v. Fontenot, 550 So.2d 179 (La.1989); State v. Decuir, 599 So.2d 358 (La.App. 3rd Cir.1992), writ denied, 605 So.2d 1095 (La.1992). When a defendant does not present any additional evidence on this issue after the pre-trial ruling, the issue can be rejected on appeal. See, e.g., State v. Regan, 601 So.2d 5 (La.App. 3rd Cir.1992), writ denied, 610 So.2d 815 (La.1993); State v. Wright, 564 So.2d 1269 (La.App. 4th Cir. 1989). Judicial efficiency demands that this court accord great deference to its pre-trial decision unless it is apparent that the determination was patently erroneous and produced unjust results. State v. Decuir, supra, at 360.
State v. Hebert, 97-1742, p. 9 (La.App. 3 Cir. 6/3/98); 716 So.2d 63, 67-68, writ denied, 98-1813 (La.11/13/98); 730 So.2d 455, cert. denied, ___ U.S. ___, 120 S.Ct. 1685, 146 L.Ed.2d 492 (2000), quoting State v. Magee, 93-643, p. 2 (La.App. 3 Cir. 10/5/94); 643 So.2d 497, 499.

Admissibility
At trial, Defendant did not object to the admissibility of Dr. Metzker's study or his conclusions concerning the "relatedness" of the DNA of the HIV from D.M. and Trahan. Instead, Defendant focused his attack on the manner in which Dr. Metzker performed the tests and the ultimate conclusions that could be drawn from the results. Although there was no objection at trial, Defendant raised his objection to admissibility in a pretrial written motion and, thus, he may raise the issue of admissibility again on appeal. La.Code Crim.P. art. 841(B); State v. Parker, 421 So.2d 834 (La.1982), cert. denied, 460 U.S. 1044, 103 S.Ct. 1443, 75 L.Ed.2d 799 (1983).
During the pretrial hearing, Defendant challenged the reliability of the Metzker report on the ground that contamination had occurred. He also attacked the manner in which Dr. Metzker performed the scientific tests. In our pretrial opinion, we held: "Whether these protocols were properly applied is a question for the trier of fact and not a gatekeeping function of the trial court." Schmidt, 699 So.2d at 457.
At trial, the jury heard testimony from Dr. Metzker and Dr. Hillis that the contamination occurred not with the HIV samples from D.M. and Trahan, but in two of the thirty-two control samples submitted from the Lafayette area. The contamination was the introduction of a laboratory strain of the HIV, HIV LAI, into two of the group control samples, but this contamination did not affect the samples from D.M. and Trahan. Dr. Hillis was of the opinion that the Metzker study was not contaminated, but suggested that another analysis of sequences extracted from separate blood samples of D.M. and Trahan be conducted. Therefore, in order to prove that the outcome of Dr. Metzker's study was not affected by the contamination or any other alleged flaw in methodology, new samples of the HIV of D.M. and Trahan were submitted to Dr. Mendell, who performed a second series of DNA sequencing. Dr. Mendell was of the opinion *153 that the samples were not contaminated in any way. Dr. Hillis opined that Dr. Mendell's test results were consistent with Dr. Metzker's and that there was no evidence of any contamination whatsoever.
In our pretrial opinion, the phylogenetic analysis used by Dr. Metzker was subjected to the Daubert/Foret/Quatrevingt test and, based upon the evidence presented at the pretrial hearing, was found admissible. At trial, the evidence presented by the State and Defendant showed how Dr. Mendell conducted the separate DNA sequencing of the HIV DNA from D.M. and Trahan and that his results were found to be consistent with Dr. Metzker's original results. Thus, the additional evidence served to strengthen the admissibility of the phylogenetic analysis of the DNA of D.M.'s and Trahan's HIV. Therefore, we shall adhere to our opinion regarding admissibility in the pretrial writ application.

Probative Value Versus Prejudicial Effect
The next issue is whether the probative value of this evidence is outweighed by its prejudicial effect. On this issue, Defendant argues that, even though the State claims that the purpose of introducing the DNA analysis of the HIV of Trahan and D.M. was not to show D.M. as the source or to show direct transmission from D.M. to Trahan, the prejudicial effect of this evidence was to establish that Defendant, in fact, used the HIV obtained from D.M.'s blood to infect Trahan. On the other hand, the State argued that the purpose of the DNA analysis was to show "relatedness" of Trahan's and D.M.'s HIV DNA. We first addressed this argument in the pretrial opinion:
The defendant concludes his attack upon the ruling of the trial court by arguing that the prejudicial impact of the evidence being offered outweighs its probative value. The weighing of these factors as set forth in La.Code Evid. art. 403 is the final step in the Daubert/Foret/ Quatrevingt analysis. Dr. Gallaher opined that the Metzker-Gibbs study can only prove "relatedness" in the abstract. Therefore, the defendant argues that offering the Metzker-Gibbs study as evidence of "relatedness" in the abstract, based upon the protocol employed by Dr. Metzker, would be prejudicial because the jury would conclude it to be direct transmission. The defendant asserts that the ability of an audience to understand the nuance between relatedness and direct transmission would depend upon the sophistication of the audience.
We note that the use of expert opinions or conclusions based on scientific tests to establish any key component of the state's case against an accused can be highly prejudicial. This prejudicial effect may arise not only in the context of scientifically unreliable testing, but also because of the potentially persuasive value of the very evidence itself. This prejudicial effect may be avoided if the trial court carefully weighs and controls this expert testimony. Foret, 628 So.2d 1116. We find that in this case, the trial court has carefully weighed the probative value against any prejudice, and we find no error in the trial court's rulings.
Schmidt, 699 So.2d at 457.
The testimony reveals that the State and Defendant thoroughly questioned the experts about what the Metzker study established and, more importantly, what it did not establish. The strength and weakness of the scientific evidence was fully explored by Defendant during his cross-examination of the State's expert witnesses. On the question of admissibility of the Metzker study, we find that there is no merit to Defendant's arguments that the trial court erred in admitting that evidence. In essence, what Defendant is attacking is the persuasiveness or weight of the experts' testimony, a decision which is left to the trier of fact.
In its closing argument, the State argued that none of the expert witnesses *154 could say that the HIV found in Trahan was unrelated to the HIV found in D.M. "Relatedness" or the degree of relationship between the HIV of D.M. and Trahan was an important issue in this case. It was important because the various experts testified that there was no way to scientifically test for transmission of HIV from one person to another person because the HIV DNA naturally mutates or evolves as it is passed from person to person. The experts, therefore, testified that the HIV of D.M. and Trahan were "related" and this bit of evidence may be considered incriminating. All incriminating evidence is, by its nature, prejudicial to a defendant, but that fact does not render the evidence inadmissible. We find that the Metzker study was sufficiently probative to outweigh its prejudicial effect, particularly when it is considered in the full context of Defendant's cross-examination of the State's witnesses and the criticisms of it by Defendant's expert witnesses.

Weight of Evidence
The next issue raised by Defendant attacks the weight of the DNA evidence. It is the State's position that, "The common thread of opinion of all of the scientific experts was that the viruses of D.M. and the victim were not not (sic) related." Even Dr. Bette Korber, one of the leading experts in the nation on phylogenetic analysis of the DNA of HIV, and one of Defendant's expert witnesses, testified that she could not say that the HIV of D.M. and HIV of Trahan were unrelated.
Defendant replies that, based on the pre-trial and trial testimony, all HIV viruses are related. Defendant's argument is that it is the degree of relatedness that is important and that the 7% variation between the HIV DNA of D.M. and Trahan, found in the statistical analysis of the two HIV DNA samples, was more consistent with an alternative source of transmission than with a direct transmission from D.M. to Trahan. To rebut that argument, the State offered Dr. Metzker's testimony to show that the DNA of the two HIV samples were significantly close in relationship. While Defendant cites the 7% variation, the State notes that the experts agreed that the HIV of D.M. and Trahan were related because they were located on the same part of the phylogenetic tree graph that represented the phylogenetic analysis.
Defendant further argued that the control group from Lafayette improperly altered the outcome of the analysis. Most of the samples in the Lafayette control group were homosexual males and not heterosexual females with the same risk factors as Trahan. Dr. Hillis testified that using a similar control group is not necessary for a proper analysis because no study has shown that certain HIV strains are associated with certain risk factors for transmission. On the other hand, Dr. William Gallaher, an expert in the field of microbiology and molecular genetics, who testified on behalf of Defendant, disagreed and opined that it is best to match the risk factors.
Finally, Defendant attacked the Baylor laboratory where Dr. Metzker performed his tests, as well as the report issued by Dr. Metzker, for failing to meet the standards of forensic science. Another of Defendant's witnesses, Dr. Sudhir Sinha, an expert in quality assurance standards for forensic testing laboratories, stated that the matter was treated as an academic study and not as a criminal forensic investigation. He testified that there were certain mistakes and a lack of certain protocols in the Baylor study. However, Dr. Sinha acknowledged that there were no forensic laboratories in the United States that were equipped and available to conduct phylogenetic testing and analysis in 1995, the time of the Metzker study. He was also of the opinion that, if any errors occurred in the Metzker study, the same result may occur in a subsequent test. As we have noted previously, Dr. Mendell conducted the same tests as Dr. Metzker and obtained similar results.
*155 When each side of a case presents qualified expert witnesses, whose conclusions or opinions differ, the jury must determine the weight to give those conclusions or opinions. The purpose of the testimony of an expert witness is to provide a basis of knowledge and background information on a subject. The jury's role, as the ultimate trier of fact, is to relate the background knowledge gained from the experts to the facts established by evidence at trial and to ultimately make a determination of guilt or innocence. State v. Hillman, 613 So.2d 1053 (La.App. 3 Cir.), writ denied, 617 So.2d 1181 (La. 1993). Although a witness may be recognized by the trial court as an expert, the trier of fact remains free to accept or reject the expert's conclusions. State v. Smith, 96-261 (La.App. 3 Cir. 12/30/96); 687 So.2d 529, writ denied, 97-0314 (La.6/30/97); 696 So.2d 1004. It is the jury's duty to weigh the testimony given by all of the witnesses, including the expert witnesses. However, the underlying purpose of expert witness testimony interpreting scientific tests or evidence is simply to assist the jury.
Although we found that the phylogenetic analysis of the DNA of the HIV of D.M. and Trahan was admissible, whether or not this evidence proved that the HIV of D.M. was closely related to the HIV of Trahan is a question that goes to the weight of the evidence presented. It is improper for a reviewing court to reweigh that evidence. Rather, an appellate court determines whether that evidence, together with all the other evidence, was sufficient for the jury to reasonably conclude that a defendant was guilty of the crime for which he was convicted. In our opinion, from the other direct and circumstantial evidence presented, including the blood samples from D.M. and L.L., the missing jot book containing the August 2 and 4, 1994 notations, Defendant's insistence that he was not infected with HIV, the suspicious injection on August 4, 1994, and Trahan's infections within the time frame of the injection, the jury could have reasonably concluded without the need for the DNA evidence that Defendant was guilty beyond a reasonable doubt.
In Caine, 652 So.2d 611, there was absolutely no DNA analysis of any HIV because the victim in Caine was not HIV positive at the time of trial, even though the defendant who stabbed her with the needle was HIV positive when he committed the crime. Accordingly, even when unreliable DNA evidence is admitted at trial, we will not presume that such evidence is prejudicial to the defendant. In Quatrevingt, 670 So.2d 197, the supreme court found that the jury's verdict of guilty of first degree murder was surely unattributable to the inadmissible DNA testimony because the other direct and circumstantial evidence was sufficient to prove the defendant's guilt. In the present case, unlike in Quatrevingt, the DNA evidence was properly admitted. However, in this case, the DNA evidence was not decisive of the State's case against Defendant, but was simply another piece of circumstantial evidence presented by the State to prove Defendant's guilt.
Therefore, this assignment of error is, likewise, without merit and is rejected.

ASSIGNMENT OF ERROR NUMBER SIX
In this assignment of error, Defendant complains of prosecutorial misconduct. However, a review of Defendant's arguments, as well as the record, reveals that he is attempting to present claims that were not properly preserved for appellate review. La.Code Crim.P. art. 841(A) provides:
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to *156 the action of the court, and the grounds therefor.
The reason for the contemporaneous objection rule was set forth in State v. Taylor, 93-2201 (La.2/28/96); 669 So.2d 364, 368, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996) (citations omitted), as follows:
[T]he contemporaneous objection rule contained in La.Code Crim.P. art. 841(A) and La.Code Evid. art. 103, does not frustrate the goal of efficiency. Instead, it is specifically designed to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings.
Defendant first complains about the introduction of evidence that Trahan had three abortions during their ten-year affair. At no time did Defendant object at trial to the introduction of this evidence. In fact, he mentioned these abortions during his opening statement and thoroughly explored the matter during cross-examination of both Trahan and Dr. Daigle. Accordingly, this matter will not be addressed on appeal because Defendant not only failed to object to the introduction of this evidence, but also actively participated in presenting this evidence to the jury.
Defendant also argues that the State withheld the testimony of two witnesses that would have presented evidence favorable to his defense, namely his former employees, Alice Bryan and Barbara Powers. These two witnesses were available for Defendant to subpoena to testify. His other employees, Toni Lalonde and Geraldine Sonnier, were called as witnesses and testified on his behalf at trial. Defendant gives no reasons why Bryan and Powers were not subpoenaed and called as witnesses.
Oddly, in his opening statement, Defendant informed the jury that one of the defenses to the State's allegation that he was obsessed with Trahan was that he lost interest in her at the time of the injection on August 4, 1994, because he was having an affair with Bryan. Bryan did not testify at trial. However, during the testimony of Detective Craft, Defendant thoroughly cross-examined Detective Craft about his alleged threat to Bryan that she may be charged with a crime, such as obstruction of justice, if her trial testimony revealed she helped to cover up Defendant's crime. Defendant implied that Bryan informed one of his attorneys that she would not testify unless the State granted her immunity from prosecution. However, Defendant never subpoenaed Bryan, and we do not know precisely what she would have said that would have affected the verdict.
Furthermore, the trial court rejected Defendant's post verdict motion for new trial, which was grounded on the allegation that the State withheld statements made by Powers and on La.Code Crim.P. art. 851(3) newly discovered evidence. In holding that the potential testimony was not newly discovered evidence, the trial court held that Defendant was presumably well aware of Power's testimony, that he could have obtained it with reasonable diligence, and that it would have been merely cumulative.
In our view, Defendant is attempting to avoid the procedural bar of La.Code Crim.P. art. 841(A) by styling his objection as a claim of prosecutorial misconduct. Our review of the record reveals that Defendant employed a trial strategy that did not result in a favorable verdict. He is now trying to raise claims that were not the subject of contemporaneous objections at trial. Thus, we find this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER SEVEN
In this assignment of error, Defendant addresses the excessiveness of the fifty-year sentence imposed upon him. The statutory range of sentence for attempted *157 second degree murder in 1994 was not more than fifty years at hard labor. La.R.S. 14:27(D)(1). Thus, the trial court sentenced Defendant to serve the statutory maximum sentence. "Maximum sentences are reserved for the most egregious and blameworthy of offenders." State v. Pyke, 95-919, p. 7 (La.App. 3 Cir. 3/6/96); 670 So.2d 713, 717. Accordingly, Defendant's sentence may appear harsh since he is a first offender. However, in State v. Cook, 95-2784 (La.5/31/96); 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996), the Louisiana Supreme Court emphasized that the only relevant question on review of a sentence is whether the trial court abused its broad sentencing discretion and not whether another sentence might be more appropriate.
For us to find that this sentence is excessive, we must find the penalty imposed is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals; and, therefore, it is nothing more than needless imposition of pain and suffering. State v. Brown, 94-1290 (La.1/17/95); 648 So.2d 872; State v. Campbell, 404 So.2d 1205 (La.1981); State v. Dubroc, 99-730 (La.App. 3 Cir. 12/15/99); 755 So.2d 297. The trial court is given wide discretion in imposing a sentence, and a sentence imposed within statutory limits will not be deemed excessive in the absence of manifest abuse of discretion. State v. Anderson, 98-492 (La.App. 3 Cir. 10/28/98); 721 So.2d 1006, writ denied, 98-2976 (La.3/19/99); 739 So.2d 781.
In the instant case, the trial court heard testimony of witnesses and argument of counsel, and it went into lengthy detail applying the sentencing guidelines set forth in La.Code Crim.P. art. 894.1 before imposing sentence. The trial court emphasized that the seriousness of the crime demanded a term of imprisonment, and to not impose such a sentence would deprecate the seriousness of Defendant's conduct. The trial court stated that the crime of attempted second degree murder is serious, but the medical inevitability associated with HIV infection accentuated the seriousness of Defendant's crime. Additionally, the trial court noted that there is currently no cure for HIV/AIDS and it is ultimately fatal. The trial court concluded from the evidence presented that Defendant planned his crime, that it was an act of deliberate cruelty against Trahan, that he used his status as a medical doctor to obtain the HIV and Hepatitis C viruses from his patients D.M. and L.L., and that he then forcibly administered the lethal injection to Trahan. Further, the trial court emphasized that Defendant, as a medical doctor, knew that Trahan, who was a nurse, could have infected others with HIV or Hepatitis C. The trial court concluded that the losses suffered by Trahan, such as severely altering her lifestyle, losing her career as a nurse, suffering enormous financial loss, and knowing that the disease with which she is infected is fatal, were tremendous. Also, the trial court found that Defendant showed no remorse for his conduct, and that all of his statements made in court were self-serving. In considering the mitigating circumstances, the trial court found that Defendant had no prior criminal record, that he was a doctor who had practiced medicine for thirteen years in Lafayette, that he was married and had three children who relied on him for support,[10] that he maintained his innocence, and noted the parole eligibility provisions applicable to him as a first offender and one who is over the age of forty-five before his sentencing.
We find that the trial court did not abuse its sentencing discretion and, therefore, Defendant's sentence is not excessive, especially when considering that he intentionally *158 infected Trahan with a fatal illness which can be spread from person to person. Thus, Defendant's act endangered not only Trahan, but her children (including her son by Defendant), her husband, and the patients with whom she came into contact with at Lafayette General Hospital. Also, since Defendant used his status as a medical doctor to obtain the HIV and Hepatitis C viruses from two of his patients, he dragged them and their medical conditions into the public arena. Defendant further used his professional status to mislead other physicians who were treating Trahan for a suspected viral infection and, thereby, prevented an earlier diagnosis and treatment of her HIV and Hepatitis C infections. He also attempted to conceal his actions by altering and concealing medical records. His actions were merciless and reprehensible, especially when committed by one to whom ultimate trust is given.
We find that the sentence imposed upon Defendant is not excessive and that this assignment of error is without merit.

ERRORS PATENT
We review all appeals in accordance with La.Code Crim.P. art. 920 for errors patent on the face of the record. After reviewing the record, we find that there are two errors patent.
First, we find that the trial court sentenced Defendant within twenty-four hours of denying his Motion for Post Judgment Verdict of Acquittal and/or For New Trial, a violation of La.Code Crim.P. art. 873. Defendant originally filed the motion on January 14, 1999, and it was denied after a hearing on February 3, 1999. Subsequently, on February 12, 1999, Defendant filed a Motion to Reconsider Denial of Motion for New Trial. The trial court addressed the motion to reconsider the denial prior to sentencing by stating the following:
We have, besides the sentencing, which is scheduled for today, a couple of, one other matter, actually, having to do with the Motion to Reconsider the Motion for New Trial and for Judgment Nothwithstanding the Verdict.
Before we turn it over to you, Gentlemen, there is some slight confusion regarding whether or not a particular part of the Motion for New Trial and/or Judgment Notwithstanding the Verdict was addressed in my ruling. For the sake of completeness, I am going to proceed as though it had not been covered, and we will just sort of take it from the beginning. That has to do with the issue of testimony of Alice Bryan.
After hearing arguments relative to a charge that the State committed misconduct when Detective Craft threatened Bryan with prosecution if she testified, the trial court denied the motion to reconsider which, in fact, was its first ruling on the issue involving Bryan's testimony. The trial court then proceeded with the sentencing hearing, where the Pre-Sentence Investigation report was discussed and Defendant introduced evidence concerning mitigating factors. After the introduction of the evidence and the arguments of counsel, the trial court discussed the factors it considered in determining the sentence to be imposed. The trial court then asked if Defendant was prepared for sentencing, to which defense counsel responded, "We are, Your Honor." Sentence was then imposed.
La.Code Crim.P. art. 873 provides, in pertinent part:
If a motion for new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
In the interest of justice, we hold that the trial court actually reopened and ruled anew upon the motion for new trial at the sentencing hearing rather than merely clarifying its earlier ruling. Since the trial court reopened and ruled on the *159 motion, Article 873's twenty-four-hour time delay applies.
Therefore, we must address whether Defendant waived the twenty-four-hour delay. In State v. Flowers, 337 So.2d 469 (La.1976), the supreme court held the defendant expressly waived the delay by replying affirmatively when asked by the trial court if he wished to be sentenced that date. Our colleagues on both the first and fifth circuits have also found implicit waivers of Article 873's delay when the defendant announces his readiness for sentencing. State v. Steward, 95-1693 (La.App. 1 Cir. 9/27/96); 681 So.2d 1007; State v. Lindsey, 583 So.2d 1200 (La.App. 1 Cir.1991), writ denied, 590 So.2d 588 (La.1992),[11] and State v. Ferrell, 94-702 (La.App. 5 Cir. 5/30/95); 656 So.2d 739, writ denied, 95-2360 (La.4/18/97); 692 So.2d 433. In State v. Diaz, 93-1309 (La. App. 3 Cir. 4/6/94); 635 So.2d 499, writ denied, 94-1189 (La.9/16/94); 642 So.2d 191, this court noted for the first time the situation where neither the defendant nor his attorney objected to sentencing being held immediately after denial of their motion for new trial and they did not assign the Article 873 violation on appeal. We, however, declared that we could find that the defendant and his attorney impliedly waived the delay by their active participation in the sentencing hearing. Since the defendant received the minimum sentence under the statute, we found the error harmless.
We are cognizant of our recent decision State v. Dronet, 97-991 (La.App. 3 Cir. 11/4/98); 721 So.2d 1038, where we found defense counsel's statement that he was ready for sentencing did not constitute a waiver of the twenty-four-hour delay required by Article 873. In Dronet, even though we could not find any prejudice as a result of the trial court's failure to observe the delay in sentencing, we noted the strict application of Article 873 as suggested by State v. Augustine, 555 So.2d 1331 (La.1990) and remanded the case for resentencing because the defendant challenged his sentence on appeal. Id. at 1040. See also State v. Williams, 96-37 (La.App. 3 Cir. 6/26/96); 677 So.2d 692. However, we can distinguish this case from Dronet since Defendant presented substantial evidence at his scheduled sentencing hearing following the trial court's denial of his motion to reconsider the motion for a new trial. Even though Defendant challenged his sentence on appeal, he can demonstrate no prejudice in the trial court's failure to wait twenty-four hours after the denial of the motion. To support our conclusion, we quote from the trial court's decision on sentencing:
I've listened carefully to all of the evidence presented to me in the form of testimony here today, and in the form of letters received from concerned persons in the community on both sides of the issue. I have considered, applied, and given weight to the sentencing guidelines provided by the Louisiana Code of Criminal Procedure, Article 894.1.
I have looked everywhere that I can look. I've given a great deal of thought over the past 4 months to this day, knowing that it would come. I have studied carefully everything that has been presented to me. I have invited any information that either side wished to present to me, so that when I do sentence the defendant, it will be with as much knowledge as I can possibly have about everything concerned.
I have looked everywhere for compelling reasons to exercise leniency in this case. Certainly, the defendant's life is unique among convicted felons. We don't normally see persons of his status in the community, his professional status for sentencing. I have listened to what everyone has said, with regard to his good works, and I have no reason to doubt them. But in the final analysis, the punishment must fit the crime. All of the good things that he has done in *160 his life, in my view, cannot tip the balance of the scales, in light of the deliberate, cruel, and extremely serious crime that he has committed.
Clearly, the trial court carefully considered the sentence for some time before pronouncing it. There is no indication that a twenty-four-hour delay would have resulted in a lesser sentence, as suggested inAugustine, 555 So.2d 1331. Therefore, we find that Defendant implicitly waived the twenty-four-hour waiting period by participating in the sentencing hearing, responding affirmatively to the trial court's question, "[I]s your client prepared for sentencing?," and failing to lodge a contemporaneous objection when the trial court proceeded with sentencing.
Secondly, the trial court improperly informed Defendant that the prescriptive period for filing post conviction relief began on the date he was sentenced. According to La.Code Crim.P. art. 930.8, the prescriptive period begins when the judgment of conviction and sentence becomes final. Thus, the trial court is instructed to inform Defendant of the two-year prescriptive period by sending written notice to him within ten days of the rendition of this opinion and filing receipt of that notice in the record.

CONCLUSION
We hold that the evidence presented at trial was sufficient to prove that the defendant, Richard J. Schmidt, committed the attempted second degree murder of Janice Trahan by injecting her with HIV. Therefore, his conviction is affirmed. We instruct the trial court to inform Defendant of the correct provisions of La.Code Crim.P. art. 930.8 as set forth above.
AFFIRMED WITH INSTRUCTIONS.
NOTES
[1] In State v. Gamberella, 633 So.2d 595, 602 (La.App. 1 Cir.1993), writ denied, 94-0200 (La.6/24/94); 640 So.2d 1341 (footnote omitted), the court noted that the "phrase `acquired immunity deficiency syndrome (AIDS) virus' is a misnomer because the actual virus is the human immunodeficiency virus (HIV). AIDS is not the virus, but, rather, is a clinical syndrome which is diagnosed when a person, who is infected with the HIV virus, develops one of a certain list of infections."
[2] Trahan had abortions in August 1988, December 1988, and June 1989.
[3] Initials are used herein to protect the juvenile's identity.
[4] Initials are used to protect this individual's identity.
[5] Initials are used to protect the individual's identity.
[6] The "super bill" is a 8― Ũ 14 inch printed form for Billing Inquiries and Insurance Information, which lists Procedures, together with Code and Fee charged for each procedure. The form also contains a list of Descriptions of various medical conditions, together with their Code and a place to check off each condition. For example, on D.M.'s August 4, 1994 super bill, the Procedure checked is listed under the heading "Injection" entitled "B-12 Injection," with a code number "J3420." The check mark which is scratched through is under the heading "Injection," entitled "Drawing Fee" with a code number "36415." Also placed on D.M.'s super bill is a check mark under "Description" for medical condition, "Anemia (Unspecified)" with a code number "285.9."
[7] For attempted second degree murder, the defendant must have the specific intent to kill and not simply an intent to inflict great bodily harm.
[8] AZT is a drug used to treat HIV.
[9] La.Code Evid. art. 404(B)(1) (emphasis added) reads:

Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
[10] We note that the trial court did not consider the child that Defendant and Trahan had together.
[11] The supreme court also stated, "The result is correct."